### GARWOLS v. BANKERS TRUST CO.

1. STATUTES—CONSTRUCTION—PRESUMPTIONS—COMMON LAW.
    It is presumed that the legislature, in enacting statutes, has in mind the rule that when a matter in dispute is not specifically controlled by constitutional or statutory provision, common-law rules, which are firmly embedded in our jurisprudence, are applied by court.

2. DESCENT AND DISTRIBUTION—ILLEGITIMATE CHILD HEIR OF MOTHER.
    The common-law disability of an illegitimate child to inherit has been removed by statute (3 Comp. Laws 1915, § 11796), and such child may now inherit as heir of mother.

Homicide as affecting devolution of property, see annotation in 3 L. R. A. (N. S.) 726; 39 L. R. A. (N. S.) 1088; L. R. A. 1915C, 328; 51 A. L. R. 1096.

3. STATUTES—REPEAL OF COMMON-LAW RULE NOT PRESUMED.

The common-law principle that ''No man shall take advantage of his own wrongs'' is firmly embedded in our jurisprudence, and there is no presumption of its repeal.

4. SAME—CONSTRUCTION—OBJECT CONSIDERED.

A statute must be construed with reference not only to its language, but its object as gathered from its various parts.

5. DESCENT AND DISTRIBUTION—STATUTES—OBJECT OF STATUTE.

The object of statute of descent and distribution is to provide for devolution of estates of persons dying intestate among those whom the legislature conceived to be natural objects of the bounty of deceased.

6. SAME—STATUTES—SON WHO MURDERS MOTHER BARRED FROM INHERITING HER PROPERTY.

In light of common-law rule preventing murderer from inheriting murdered ancestor's property, statute of descent and distribution is construed so as to bar illegitimate son from inheriting property of his mother whom he murdered for express purpose of securing it, although there is no such exception in the statute (3 Comp. Laws 1915, § 11796).

Appeal from Genesee; Parker (James S.), J. Submitted April 15, 1930. (Docket No. 120, Calendar No. 34,859.) Decided October 3, 1930.

Bill by George Garwols against the Bankers Trust Company, as administrator of the estate of Nancy Garwols, deceased, and another to restrain distribution of the deceased's estate. Hannah Garwols and another intervened as plaintiffs. From an order dismissing interveners' bill, they appeal. Reversed.

*Wilson & Hoffman,* for interveners.

*Cook, Sheppard & Stipes* and *Horace P. Martin,* for defendants.

SHARPE, J. The intervening plaintiffs, Hannah Garwols and Jennie Scott (hereafter called the

plaintiffs), appeal from a decree dismissing their bill of complaint. The allegations therein may be summarized as follows:

The plaintiffs are sisters of Nancy Garwols, the divorced wife of George Garwols. Prior to her marriage, she gave birth to an illegitimate son, the defendant Harry McClennan. This son became enamored of a woman whom he desired to marry, but who was unwilling to become his wife because of his poverty. In order to secure the property owned by his mother, and to which he was the sole heir, Harry deliberately murdered her. He was apprehended, and, on being brought to trial, pleaded guilty to the charge and was sentenced to life imprisonment in the branch State prison at Marquette, where he is now confined. The defendant trust company was appointed administrator of the mother's estate, and is threatening to turn over to Harry, as the only heir-at-law of the deceased, the property in its hands, amounting to about $15,000.

The question presented is thus stated by plaintiffs' counsel:

"Can an illegitimate child, who murdered his mother for the purpose of securing his inheritance, be let into the inheritance under the statutes of descent?"

The trial court, after referring to the statute (3 Comp. Laws 1915, § 11796), which provides that "Every illegitimate child shall be considered as an heir of his mother, and shall inherit her estate, in like manner as if born in lawful wedlock," said:

"The theory of preventing a murderer from reaping the benefit resulting from his crime appeals to the court's sense of justice. The legislature, however, having power to declare a rule of descent and having

done so in clear and unequivocal language, leaves in this court no discretion.''

No such case has ever been presented to this court. The question is a new one. That the son is illegitimate in no way affects it. The deceased might have disposed of her property as she saw fit. This son had no legal claim upon it. He sought to secure it to himself by deliberately taking the life of his mother. This act and its motive so shock our sense of justice that we should give most careful thought to the considerations urged as a reason why he should not be permitted to inherit.

In California, Kansas, Iowa, and Oklahoma, the right of an heir to take under such circumstances is denied by statute. We have no such provision in our statute. It is plain and unambiguous, and, unless it can be demonstrated to a reasonable certainty that our legislature presumably intended to bar an heir who deliberately takes the life of his ancestor for the purpose of securing the estate, we must affirm the decree, as courts under our Constitution have no power to legislate.

In the schedule annexed to our State Constitution it is declared that—

''The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed.''

In 12 C. J. p. 178, it is said:

''The unwritten or common law is the embodiment of principles and rules inspired by natural reason, an innate sense of justice, and the dictates of convenience, and voluntarily adopted by men for their government in social relations. The authority of its rules does not depend on positive legislative

enactment, but on general reception and usage, and the tendency of the rules to accomplish the ends of justice.''

This court has on many occasions applied the rules of the common law in cases before it when the matter in dispute was not specifically controlled by a constitutional or statutory provision. These rules are firmly embedded in our jurisprudence, and it is presumed that the legislature had them in mind when enacting statutes. Endlich, Interpretation of Statutes, § 127. Chancellor Kent in his Commentaries (Vol. 1, p. 464) says:

''Statutes are likewise to be construed in reference to the principles of the common law; for it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. This has been the language of the courts in every age; and when we consider the constant vehement, and exalted eulogy which the ancient sages bestowed upon the common law as the perfection of reason, and the best birthright and noblest inheritance of the subject, we cannot be surprised at the great sanction given to this rule of construction.''

And—

''If by interpretation they'' (the common law and the statutes) ''may stand together, they shall so stand.'' Smith's Commentaries, p. 879, § 757.

In *Bandfield* v. *Bandfield,* 117 Mich. 80, 82 (40 L. R. A. 757, 72 Am. St. Rep. 550), the following from 9 Bac. Abr. tit. ''Statute,'' I (4), 245, was quoted with approval:

''In all doubtful matters, and where the expression is in general terms, statutes are to receive such a construction as may be agreeable to the rules of

the common law in cases of that nature; for statutes are not presumed to make any alteration in the common law, farther or otherwise than the act expressly declares; therefore, in all general matters, the law presumes the act did not intend to make any alteration; for if the parliament had had that design, they would have expressed it in the act."

In our early case of *Wales* v. *Lyon,* 2 Mich. 276, 282, it was said:

"Statutes are to be construed in reference to the common law, and it is never to be presumed that the legislature intended to make any innovation upon the common law any further than the case absolutely required in order to carry the act into effect. * * * And if the apparent meaning of the statute is opposed to well settled general principles it should be restrained or enlarged so as to conform to such general principles. * * * This is the only safe rule to adopt in the construction of statutes."

In *Whipple* v. *Saginaw Circuit Judge,* 26 Mich. 342, this court was called upon to construe the statute providing for the transfer of causes in cases wherein the circuit judge was disqualified from acting. It was said (p. 345):

"By the fundamental principles of the common law, no man could be judge in his own case; and no statute was needed to declare this principle."

And the act was construed as though the common law disqualification was written into it.

In *Crane* v. *Reeder,* 21 Mich. 24 (4 Am. Rep. 440), the court said (p. 66):

"It is implied in all statutes that they shall be read in accordance with the recognized rules of interpretation, and apply to such persons or things as fall naturally within their scope. It is not cus-

tomary in passing acts to express such disabilities as should be implied."

"For there is no such thing as a natural line of inheritance independent of the law." *Id.* p. 73.

It was held that aliens could not inherit because of a common-law disability which had not been removed by statute.

Our statute of limitations contains no exceptions, and yet the courts create them in cases of fraudulent concealment of the cause of action.

Under the common law, an illegitimate child was not entitled to inherit. This disability has been removed by our statute, and the right of the son here to take is the same as though he had been born in lawful wedlock. But, among the fundamental legal principles of the common law was the maxim that "No man shall take advantage of his own wrong" (Broom, Legal Maxims [9th Ed.], 201), or, as stated by this court in *Kiplinger* v. *Green,* 61 Mich. 340, 347 (1 Am. St. Rep. 584), "He cannot profit by his own wrong." This maxim or legal principle is firmly embedded in our jurisprudence, and it is to be presumed that our legislature at all times had it in mind. There is no presumption of its repeal. Endlich, Interpretation of Statutes, § 127; Bishop on Written Laws, § 142.

This court has also said that a statute "must be construed with reference not only to its language, but its object as gathered from its various parts." *Washburn* v. *People,* 10 Mich. 372, 384, quoted approvingly in *Hatch* v. *Calhoun Circuit Judge,* 127 Mich. 174, 176. And that—

"It is a familiar principle of law that, in construing a statute, we must consider the occasion of its enactment and the purpose to be accomplished." *Bennett* v. *Michigan Pulpwood Co.,* 181 Mich. 33, 40.

The object of the statute of descent and distribution is to provide for the devolution of estates of persons dying intestate among those whom the legis-' lature conceived to be the natural objects of the bounty of the deceased.· It may well be said—

"to be founded on the great principles of justice, with the object of making such a will for the intestate as he would himself probably make, its obvious policy being to follow the lead of the natural affections, and to consider as most worthy the claims of those who stand nearest to the affections of the last occupant." · 9 R. C. L. p. 12.

In the enactment of this law it was unnecessary for the legislature to contemplate that an emergency such as is here presented should arise, concerning which provision should be made. The omission to so foresee and to provide therefor cannot be presumed to work a repeal of the fundamental rule of the common law under which this murderer is disabled from inheriting. By so holding we are not grafting an exception into the statute by construction, but we are construing the statute according to the obvious intent of the legislature.

"It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, * * * or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended

to include the particular act." *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (12 Sup. Ct. 511).

The common-law rule is thus stated in Wharton on Homicide (3d Ed.), § 665:

"To permit a person who commits a murder, or any person claiming under him, to benefit by his criminal act, would be contrary to public policy. And no devisee can take under the will of a testator whose death has been caused by the criminal and felonious act of the devisee himself. And in applying this rule, no distinction can be made between a death caused by murder and one caused by manslaughter. Nor does the common-law right of succession by descent operate in favor of one who wilfully takes the life of his ancestor for the purpose of succeeding to his property rights. And the common-law right of a man to succeed to the property of his wife upon her death does not operate in favor of one who murders his wife. And the rule that the common-law doctrine of succession to property does not operate in favor of one who wilfully takes the life of his ancestor should apply against any person claiming through or under the slayer. Nor does a rule of law that a common-law right of succession to property does not operate in favor of one who wilfully takes the life of his ancestor contravene a constitutional provision that a conviction of crime shall not work a forfeiture of the estate."

It is insisted that "under our law, there is no longer corruption of blood or forfeiture of estates for conviction of crime." But there is a clear distinction between divesting of property and denying one's right to inherit. It is not here sought to forfeit the estate of the heir, but to prevent him from acquiring property which he seeks to obtain by the murder of his ancestor. Counsel for the defendant

call attention to *Keeler* v. *Dawson,* 73 Mich. 600, 602, in which it was said: "It belongs to the legislature to. define and establish the transmission of estates," and to *In re Shumway's Estate,* 194 Mich. 245, 251, wherein the court said:

"The common law touching descent of estates has never obtained in Michigan. The statute of descent is and always has been the only existing law on that subject in this State."

It is not here sought to engraft a provision of the common law upon this statute. But we read the statute and then, in the light of the rule of the common law preventing murderers from inheriting, conclude that the legislature must have had this disqualification in mind at the time of its adoption.

The statute is in general terms, and controls the descent and distribution of property under normal conditions. It does not provide that a son who murders his mother shall inherit her property. It cannot be conceived that the legislature had in mind so shocking a result in its enactment. In our opinion, it must be assumed that it intended to leave such an exceptional case to be determined by the rules of the common law which have so long had place in our jurisprudence.

While the decisions of other courts of last resort are entitled to great respect when considering a question on which this court is called upon to pass for the first time, the responsibility rests upon us to decide it as in our opinion law and justice require. The weight of authority may be said to be against the conclusion we have reached. These decisions (hereafter referred to) rest upon the holding that the right conferred by the statute is clear and unambiguous, and that judicial tribunals have no

concern with the policy of the legislature in their enactment.

Many of the appellate courts have held otherwise, and the reasons assigned therefor more nearly coincide with our views as to the considerations which should control in reaching decision. In *Riggs* v. *Palmer,* 115 N. Y. 506 (22 N. E. 188, 5 L. R. A. 340), it was held that a young man, familiar with the provisions of the will of his grandfather in his favor, who, in order to prevent its revocation and to obtain the speedy enjoyment and immediate possession of the property devised and bequeathed to him, wilfully murdered the grandfather by poisoning, was not entitled to take thereunder. It was said that the fundamental maxim of the common law that "no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime" must be considered in the construction to be placed upon the State statutes relating to wills. It was further said:

"What could be more unreasonable than to suppose that it was the legislative intention in the general laws passed for the orderly, peaceable and just devolution of property, that they should have operation in favor of one who murdered his ancestor that he might speedily come into the possession of his estate? Such an intention is inconceivable. We need not, therefore, be much troubled by the general language contained in the laws."

The following from the opinion of Mr. Justice Field in *New York, etc., Ins. Co.* v. *Armstrong,* 117 U. S. 591, 600 (6 Sup. Ct. 877), was quoted with approval:

"Independently of any proof of the motives of Hunter in obtaining the policy, and even assuming

that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired.''

While this quotation (as said by many judges when referring to it) was probably *dictum,* it may be considered as expressive of the personal views of that justice and of the New York court which adopted it.

There was dissent by two justices from the opinion in the *Riggs Case* on the ground that the court was ''bound by the rigid rules of law, which have been established by the legislature, and within the limits of which the determination of this question is confined.''

In *Slocum* v. *Metropolitan Life Ins. Co.,* 245 Mass. 565 (139 N. E. 816, 27 A. L. R. 1517, 1521), it was held that a beneficiary (a husband) could not collect upon a policy of insurance on the life of his wife, whom he had murdered. The court said:

''The same principle of public policy which precludes him from claiming directly under the insurance contract, equally precludes him from claiming under the statute of descent and distribution.''

Many authorities are cited to sustain this holding.

In the case of *Box* v. *Lanier,* 112 Tenn. 393, 409 (79 S. W. 1042, 64 L. R. A. 458), the court said:

''It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: 'No one shall be permitted to profit by

his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted·by public policy, and have their foundation in universal law administered in all civilized countries.' These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in text-books and in reported cases. Without their recognition and enforcement by the courts, their judgments would excite the indignation of all right-thinking people. The first of these maxims is applied in order to prevent one from taking the benefit of his own fraud. Why should not the last be enforced so as to forbid a party receiving the fruits of his own crime?''

One of the most recent cases in which this question was decided is *In re Estate of Tyler,* 140 Wash. 679 (250 Pac. 456, 51 A. L. R. 1088). The authorities supporting the conclusion we have reached are there collected and discussed, and in the note thereto in the latter citation. There was dissent on the part of three of the justices, based entirely on the assertion that the majority opinion was ''unwarranted judicial legislation.''

Cases in which the question has been discussed and decided, and the annotations thereto, will be found in 5 L. R. A. 340; 25 L. R. A. 564; 64 L. R. A. 458; 3 L. R. A. (N. S.) 726; 16 L. R. A. (N. S.) 244; 39 L. R. A. (N. S.) 1088; L. R. A. 1915C, 328; 7 A. L. R. 823; 27 A. L. R. 1517; 51 A. L. R. 1088. An interesting discussion of the question appears in 31 Law Notes, 9.

Guided by these considerations, and supported by the authorities relied upon, this court should, in our opinion, construe our statutes of descent and

distribution as a bar to this son's inheriting the property of his mother, whom he foully murdered for the express purpose of securing it, and thus prevent the unjust, unrighteous, and abhorrent result which would follow the construction placed upon it by those acting in his behalf.

The decree entered is reversed, with costs to appellants, payable out of the estate, and one will be here entered in conformity herewith.

WIEST, C. J., and BUTZEL, CLARK, POTTER, and FEAD, JJ., concurred with SHARPE, J.

NORTH, J. (*concurring for reversal*). While I fully concur in the decision of this case as written by Mr. Justice SHARPE, I am of the opinion that the rule of law which this court is now called upon for the first time to pronounce is not stated by Justice SHARPE in terms that are sufficiently broad. The rule as announced by him seems to bar inheritance only in those cases where the life of the property owner has been taken "for the express purpose of securing" his property. I think we are not at all concerned with the purpose which prompted the homicide, and that to hold otherwise will lead to much litigation in determining the descent and distribution of the estate of the deceased. This should not depend upon the particular intent which prompted commission of the crime. I do not find such limitations in the statutes enacted on this subject in other States, nor will it generally be found in the holdings of the courts. The rule of law should be that no inheritance, devise, or bequest can be taken by one who is convicted of having intentionally and feloniously caused the death of the one from whom such inheritance, devise, or bequest would come.

This is in accord with the common-law rule quoted in the opinion of Justice SHARPE from Wharton on Homicide.

BUTZEL and McDONALD, JJ., concurred with NORTH, J.