ORZEL v SCOTT DRUG COMPANY

Docket No. 98506. Argued April 4, 1995 (Calendar No. 1). Decided
August 15, 1995.

Slyvia E. Orzel, as guardian of John J. Orzel, a legally incapaci-
tated person, and other relatives of John Orzel, brought an
action in the Wayne Circuit Court against Scott Drug Com-
pany, alleging that the pharmacy negligently supplied Desoxyn,
a schedule 2 controlled substance, to John, causing permanent
physical and psychological addiction to the drug, which re-
sulted in mental illness, and that this caused them to experi-
ence a loss of companionship and to incur numerous medical
expenditures on John's behalf. The court, Helene N. White, J.,
entered judgment on a jury verdict for the plaintiffs, but found
John to be fifty percent comparatively negligent. Thereafter,
the court granted the defendant's motion for judgment notwith-
standing the verdict because John's illegal purchase and use of
the drug barred their claims. The Court of Appeals, MURPHY
and MARILYN KELLY, JJ. (JANSEN, P.J., dissenting), reversed in
an unpublished opinion per curiam, finding that the illegal
conduct should not operate to bar the claim and that compara-
tive negligence principles should apply. The Court further
stated that, even assuming that the illegal conduct would
normally operate to bar recovery, the bar could not apply
because John was insane at the time that he committed his
illegal acts, making him unaccountable (Docket No. 117270).
The defendant appeals.

In a unanimous opinion by Justice CAVANAGH, the Supreme
Court *held:*

None of the limitations or exceptions to the wrongful-conduct
rule apply; thus, the plaintiffs' claim is barred because it is
based in part on John Orzel's illegal conduct. The claims of his
relatives, also based in part on his illegal conduct, likewise are
barred under the wrongful-conduct rule.

1. The wrongful-conduct rule provides that courts should not
lend their aid to plaintiffs who found their causes of action on
personal illegal conduct. Merely because a plaintiff was engag-
ing in illegal conduct at the time of injury does not automati-
cally bar a claim under the rule. Rather, such conduct must be
prohibited, or almost entirely prohibited, under a penal or

criminal statute. Also, for the rule to apply, a sufficient causal nexus, i.e., a proximate cause must exist between the plaintiff's illegal conduct and the asserted damages.

2. An exception to the rule may apply where, even though a plaintiff engaged in serious illegal conduct that proximately caused the plaintiff's injuries, the defendant's culpability is greater than the plaintiff's. Recovery also may be had, notwithstanding a statute's violation, where the statute explicitly provides for recovery, or where the court determines that the plaintiff falls within the class of persons the statute was devised to protect.

3. In this case, John Orzel's illegal conduct is of the type that warrants application of the wrongful-conduct rule because, by his own admissions, as well as those of his counsel, he repeatedly violated several provisions of the controlled substances act. The conduct, engaged in while he was sane necessarily was a proximate cause of his asserted injuries. That conduct cannot be characterized as a separate transaction from his use while he was insane because his initial consumption of Desoxyn inevitably led to his subsequent use while he was insane. Consequently, any injuries that are a direct result of his use while he was insane are also foreseeable consequences of his use while he was sane. The culpability exception does not apply because it was John Orzel, by his continuous illegal use of the drug, who caused the addiction and the insanity. Nor does the statutory exception apply because John Orzel clearly does not fall within the class of persons that the statutes were intended to protect.

Reversed.

*Lakin, Worsham & Victor, P.C.* (by *Larry A. Smith*), for the plaintiffs.

*Highland & Zanetti, P.C.* (by *John N. Highland*), for the defendant.

Amicus Curiae:

*Kallas & Henk, P.C.* (by *Constantine N. Kallas*), for Michigan Association of Insurance Companies.

CAVANAGH, J. In this case, we are asked to determine whether plaintiffs can maintain a tort

action where plaintiffs' asserted injuries arose out of illegal conduct *on the part of one of the plaintiffs,* the plaintiff's culpability is equal to the defendant's and the plaintiff's alleged entitlement to recovery is not provided for under the statutes claimed to have been violated by the defendant. We hold that, under such circumstances, the plaintiffs are precluded from bringing their action.

In this case, we have also been asked to articulate the scope of a pharmacist's duty when filling prescriptions issued by licensed physicians. Because of our holding, any comment that we would make regarding a pharmacist's duty would be dicta. While we consider the issue to be jurisprudentially significant, we also believe that our examination of it is best reserved for a case in which our discussions would carry binding precedential effect. Accordingly, we decline to address the issue at this time.

In view of our holding barring the plaintiffs' claim on the basis of illegal conduct, we reverse the decision of the Court of Appeals, and affirm the order of the trial court granting the defendant judgment notwithstanding the verdict.

### I. FACTS AND PROCEDURAL HISTORY

The plaintiffs, John Orzel and his relatives, filed this suit in 1983 against several defendants, claiming that each defendant negligently supplied the drug Desoxyn to John Orzel. Desoxyn, a trade name for the chemical methamphetamine,[1] is a schedule 2 controlled substance,[2] and, accordingly, may be lawfully obtained only with a valid pre-

---

[1] Methamphetamines are similar to amphetamines, differing only in the point of attachment of a methyl ($CH_3$) group. Like amphetamines, methamphetamines operate as stimulants and are highly addictive.

[2] MCL 333.7214(c)(ii); MSA 14.15(7214)(c)(ii).

scription. In their complaint, the plaintiffs asserted that the defendant's negligence caused John Orzel to suffer the following damages:

> John J. Orzel became physically and psychologically addicted to Desoxyn which said addiction resulted in auditory and visual hallucinations and mental illness including but not limited to paranoid schizophrenia. As a result of mental derangement and illness, plaintiff has sustained pain, suffering and disability including loss of earning capacity and has required medical aid and attention and hospital care and treatment.

The plaintiffs contend that these injuries are permanent in nature. The plaintiff relatives, further claim that the injuries cause them to experience a loss of companionship and to incur numerous medical expenditures.

When trial finally commenced in 1988, Scott Drug, was the only remaining defendant. The plaintiffs had claimed that this defendant pharmacy had breached common-law and statutory duties owed to John Orzel when it filled Desoxyn prescriptions for him without asking for identification[3] or allowing an adequate interval between prescriptions,[4] and where the prescriptions read for purposes of "weight control," when they allegedly should have said "obesity."[5]

---

[3] The evidence at trial showed that John Orzel presented the defendant with prescriptions for Desoxyn where the prescriptions had been written for persons with names other than "John Orzel." The defendant still filled such prescriptions and gave them to John Orzel.

[4] Each Desoxyn prescription given to John Orzel was for one month's supply. Nevertheless, on several occasions, the defendant filled more than one prescription for John Orzel within the same month.

[5] According to a Board of Medicine regulation applicable to physicians, physicians must indicate on amphetamine prescriptions "whether the purpose is for the treatment of obesity, narcolepsy, hyperactivity, or another purpose which the board has authorized by

In his deposition, John Orzel explained that his use of Desoxyn did not begin the first time that the defendant filled a Desoxyn prescription for him. Sometime between 1979 and 1980, he began to use Desoxyn purchased from his co-workers at General Motors. By November 1980, he was taking one to two Desoxyns a day. By January 1981, he had increased his intake to three to five Desoxyns a day. By March 1981, he began to hear voices, experience hallucinations, and suffer from paranoid delusions because of the Desoxyn use. By April 1981, he raised his Desoxyn consumption to five to six Desoxyns a day. By May 1981, his use had escalated to five to eight Desoxyns a day. By June 1981, he was consuming eight to ten Desoxyns a day. In July 1981, he was forced to take a medical leave from his job at General Motors.

John Orzel testified that he knew that his purchase and use of Desoxyn was illegal. He also indicated that he was addicted to Desoxyn by July 1981. The plaintiffs additionally contend that by July 1981, John Orzel was no longer taking Desoxyn voluntarily, and that he was suffering from amphetamine psychosis to the point of being rendered legally insane so that he could not conform his conduct to the requirements of law.

In August 1981, John Orzel started going to the Figure Eight Weight Loss Clinic one to three times a week. There he would misrepresent to the physicians that he desired to lose weight, and the physicians would write him Desoxyn prescriptions for "weight control." It is uncontested that he never wanted or needed to lose weight, and that

written waiver." 1979 AC, R 338.2303(3). A disputed issue at trial was whether this regulation also governed the conduct of pharmacists so that they would be prohibited from dispensing amphetamines unless the prescription explicitly indicated that it was for one of the three purposes stated in the regulation.

the only reason he went to the clinic was to obtain Desoxyn.

The defendant filled Desoxyn prescriptions for John Orzel, allegedly beginning in August 1981, and ending in January 1982. According to the evidence presented at trial, the defendant filled a total of between six to nine Desoxyn prescriptions for him, and each prescription was for a medically acceptable one month's supply of thirty tablets. Consequently, in total, John Orzel obtained between one hundred eighty to two hundred seventy Desoxyn tablets from the defendant. Each prescription that John Orzel presented to the defendant had been signed by a licensed physician.

John Orzel testified that during the period that defendant was filling Desoxyn prescriptions for him, August 1981 to January 1982, he was also obtaining Desoxyn from other sources. He would have some of his prescriptions from Figure Eight filled by other pharmacies. He also continued to purchase Desoxyn from his General Motors co-workers. He testified that, at his peak, he was using between ten to fifteen Desoxyns a day between August 1981, and January 1982.

In January 1982, he entered Northville Mental Hospital where he stayed until April 1982. Shortly after his discharge, he resumed his use of controlled substances, including the use of Desoxyn. No longer able to obtain prescriptions for Desoxyn, he purchased and used Desoxyn from street sources. John Orzel's persistent use of controlled substances[6] has resulted in further hospitalization on several occasions.

Dr. Finklestein, a psychiatrist and psychoanalyst who examined John Orzel in 1983, testified that he suffers from amphetamine psychosis, and that he

[6] From 1983 through 1986, he continued his drug use, purchasing and using mostly cocaine and Tylenol No. 4.

is "insane," "mentally ill," and "obviously crazy, in the usual sense of the word." Dr. Finklestein attributed this psychosis to the heavy dosages of Desoxyn that John Orzel took in 1981, and opined that any subsequent drug use rendered him merely harder to treat.

Dr. Griffith, a psychiatrist who examined John Orzel in August 1986, testified that he suffers from paranoid schizophrenia induced by his Desoxyn consumption. Dr. Griffith explained that, although John Orzel was genetically predisposed to schizophrenia, the large doses of Desoxyn caused the onset of his schizophrenia.

The defendant made several motions to have this case summarily dismissed. Before trial, it filed two motions for summary disposition in which it disclaimed the plaintiffs' allegations that it had breached duties to John Orzel in the way that it filled the Desoxyn prescriptions for him. The trial court denied both motions. A few days before the scheduled trial date, it was determined that John Orzel was competent to be deposed. During a deposition held shortly thereafter, he testified regarding the complete history of his illegal transactions with Desoxyn. In response to this testimony, the defendant immediately renewed the motion for summary disposition—but this time adding an argument that, notwithstanding any breach it may have committed, the plaintiffs were precluded from any recovery because of John Orzel's illegal conduct in connection with Desoxyn. The trial judge took this motion, as well as a subsequent similarly based motion for a directed verdict, under advisement.

Without ruling on the motions, the trial judge instructed the jury to apply comparative negligence principles to determine the extent of each party's responsibility for the damages, if any. The

jury found the defendant negligent, and assessed plaintiffs' damages at $3.8 million. The jury also found John Orzel to be fifty percent comparatively negligent, and the verdict was reduced to $1.9 million.

The defendant moved for judgment notwithstanding the verdict, and the trial judge granted the motion on the basis that John Orzel's illegal acts barred the plaintiffs' claim.

A Court of Appeals majority reversed the trial court in an unpublished opinion per curiam, issued December 14, 1993 (Docket No. 117270). The majority opined that John Orzel's illegal conduct should not operate to bar the plaintiffs' claim and that comparative negligence principles should apply to determine the extent of their potential recovery. Alternatively, the majority indicated that, even assuming John Orzel's illegal conduct would normally operate to bar recovery, the bar could not apply in this case because evidence showing that John Orzel was insane at the time that he committed his illegal acts made him unaccountable for the acts.

Dissenting, Judge KATHLEEN JANSEN believed that John Orzel's illegal conduct blocked the plaintiffs' action. She also questioned his alleged insanity status in light of the legal standard for insanity under MCL 768.21a(1); MSA 28.1044(1)(1).

The defendant sought leave to appeal in this Court, which we granted. 447 Mich 1007 (1994).

## II. STANDARD OF REVIEW FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The standard of review for judgments notwithstanding the verdict requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party. *Wads-*

*worth v New York Life Ins,* 349 Mich 240; 84
NW2d 513 (1957); *Schutte v Celotex Corp,* 196
Mich App 135; 492 NW2d 773 (1992). Only if the
evidence so viewed fails to establish a claim as a
matter of law, should a motion for judgment not-
withstanding the verdict be granted. *Id.*

### III. ACTIONS BASED ON A PLAINTIFF'S ILLEGAL CONDUCT

#### A. THE WRONGFUL-CONDUCT RULE

When a plaintiff's action is based, in whole or in
part, on his own illegal conduct, a fundamental
common-law maxim generally applies to bar the
plaintiff's claim:

> [A] person cannot maintain an action if, in order
> to establish his cause of action, he must rely, in
> whole or in part, on an illegal or immoral act or
> transaction to which he is a party. [1A CJS, Ac-
> tions, § 29, p 386. See also 1 Am Jur 2d, Actions,
> § 45, p 752.]

When a plaintiff's action is based on his own
illegal conduct, and the defendant has participated
equally in the illegal activity, a similar common-
law maxim, known as the "doctrine of in pari
delicto" generally applies to also bar the plaintiff's
claim:

> [A]s between parties in pari delicto, that is
> equally in the wrong, the law will not lend itself to
> afford relief to one as against the other, but will
> leave them as it finds them. [1A CJS, Actions, § 29,
> p 388. See also 1 Am Jur 2d, Actions, § 46, p 753.]

We shall refer to these maxims collectively as
the "wrongful-conduct rule." Michigan courts have
long recognized the existence of the wrongful-

conduct rule. See *Lichon v American Universal Ins Co,* 435 Mich 408; 459 NW2d 288 (1990); *Miller v Radikopf,* 394 Mich 83; 228 NW2d 386 (1975); *Manning v Bishop of Marquette,* 345 Mich 130; 76 NW2d 75 (1956); *Cook v Wolverine Stockyards Co,* 344 Mich 207; 73 NW2d 902 (1955); *Budwit v Herr,* 339 Mich 265; 63 NW2d 841 (1954); *Piechowiak v Bissell,* 305 Mich 486; 9 NW2d 685 (1943); *Ohio State Life Ins Co v Barron,* 274 Mich 22; 263 NW 786 (1935); *Garwols v Bankers Trust Co,* 251 Mich 420; 232 NW 239 (1930); *McDonald v Hall,* 193 Mich 50; 159 NW 358 (1916); *Pantely v Garris, Garris & Garris, PC,* 180 Mich App 768; 447 NW2d 864 (1989); *Glazier v Lee,* 171 Mich App 216; 429 NW2d 857 (1988); *Imperial Kosher Catering, Inc v Travelers Indemnity Co,* 73 Mich App 543; 252 NW2d 509 (1977).

The rationale that Michigan courts have used to support the wrongful-conduct rule are rooted in the public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct. *Manning* at 133. *Glazier* at 220.[7] If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. *Radikopf* at 89. Second, some wrongdoers would be able to receive a profit[8] or compensation[9]

[7] Accord 1A CJS, Actions, § 29, p 387; 1 Am Jur 2d, Actions, § 45, p 752.

[8] For cases in which the plaintiff stood to profit from his wrongdoing if allowed to pursue his claim based on his own illegal conduct, see *Budwit* and *Garwols* (a plaintiff who murdered his wife sought the proceeds of an insurance policy in which he had been named a beneficiary) and *Imperial Kosher Catering* (a plaintiff who had been convicted of arson sought fire insurance proceeds).

[9] The plaintiffs err when they argue that the wrongful-conduct rule only applies in cases in which the plaintiff seeks to profit from personal illegal conduct. While Michigan courts have applied the

as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice.[10] Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties. As stated by the Court of Appeals, where the plaintiff has engaged in illegal conduct, it should be the "plaintiff's own criminal responsibility which is determinative." *Glazier* at 221.[11]

---

wrongful-conduct rule in such cases, see n 8, Michigan courts have also considered applying or have applied the wrongful-conduct rule in cases in which the plaintiff sought compensation for injuries stemming from his illegal conduct, rather than seeking a profit per se. See *Manning* (the Court contemplated applying the wrongful-conduct rule even though the plaintiff did not seek to profit from her criminal conduct); *Piechowiak* (the Court applied the wrongful-conduct rule even though the facts made clear the plaintiff could not and did not seek to profit from his crime); *Glazier* and *Pantely* (the Court of Appeals applied the wrongful-conduct rule even though the plaintiff sought damages that could be characterized as compensation rather than a profit). Thus, in Michigan, the principle that one may not profit from his own wrong has been extended to tort actions where plaintiffs seek compensation for injuries resulting from their own illegal activities.

[10] As recognized by the Court of Appeals:

"To permit a recovery . . . [would] be illogical, would discredit the administration of justice, defy public policy and shock the most unenlightened conscience. To sustain such a judgment would be to encourage and give support to the current thoughtless and carping criticisms of legal procedure, and to justify the gibe that the administration of the law is the only remaining legalized lottery." [*Imperial Kosher Catering* at 545-546, quoting *Eagle, Star & British Dominions Ins Co v Heller,* 149 Va 82, 111; 140 SE 314 (1927).]

[11] In cases in which both the plaintiff and the defendant equally participated in the illegal activity, Michigan courts have refrained from affording relief to one wrongdoer against another and instead espouse the view that it is better to "leave the parties where [the court] finds them." *Pantely* at 774.

Suit is barred not because the defendant is right, but rather because the plaintiff, being equally wrong, has forfeited any claim to the aid of the court. See, for example, *Jones v Chen-*

Notwithstanding these compelling reasons for applying the wrongful-conduct rule in all cases in which the plaintiff's claim is based on his illegal conduct, the wrongful-conduct rule is a general rule, and, like all general rules, it has its limitations and exceptions.

### B. NATURE OF WRONGFUL CONDUCT

The mere fact that a plaintiff engaged in illegal conduct at the time of his injury does not mean that his claim is automatically barred under the wrongful-conduct rule. To implicate the wrongful-conduct rule, the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute. Cases in which the wrongful-conduct rule has been applied include: *Radikopf* (illegal lottery); *Manning* (trespass and gambling); *Cook* (illegal contract); *Budwit* (murder); *Piechowiak* (embezzlement); *Ohio State Life Ins Co* (murder); *Garwols* (murder); *McDonald* (illegal contract); *Pantely* (perjury); *Glazier* (murder); *Imperial Kosher Catering* (arson).

In contrast, where the plaintiff's illegal act only amounts to a violation of a safety statute, such as traffic and speed laws or requirements for a safe workplace, the plaintiff's act, while illegal, does not rise to the level of serious misconduct sufficient to bar a cause of action by application of the wrongful-conduct rule. See *Klanseck v Anderson Sales,* 426 Mich 78; 393 NW2d 356 (1986) (the plaintiff violated the motorcycle licensing statute); *Longstreth v Gensel,* 423 Mich 675; 377 NW2d 804 (1985) (minor plaintiff violated the statute prohibiting driving while under the influence of alcohol);

---

*nault,* 323 Mich 261; 35 NW2d 256 (1948). [*Pantely* at 774. Accord 1A CJS, Actions, § 29, p 388; 1 Am Jur 2d, Actions, § 46, p 753.]

*Zeni v Anderson,* 397 Mich 117; 243 NW2d 270 (1976) (the plaintiff violated the statute requiring pedestrians to walk on the sidewalk, or if there is no sidewalk, on the left side of the highway facing traffic); *Massey v Scripter,* 401 Mich 385; 258 NW2d 44 (1977) (the plaintiff violated the statute requiring bicycle riders to ride on the right side of the road); *Hardy v Monsanto Enviro-Chem Systems, Inc,* 414 Mich 29; 323 NW2d 270 (1982) (the plaintiff violated the labor safety statute). Accord Prosser & Keeton, Torts (5th ed), § 36, p 232; Schwartz, Comparative Negligence (3d ed), § 6-3, p 145; Woods, Comparative Fault (2d ed), § 10:5, p 212.

John Orzel's illegal conduct is of the type that warrants application of the wrongful-conduct rule. By his own admissions, as well as that of his counsel, he repeatedly violated several provisions of the controlled substances act[12] when he obtained,[13] possessed,[14] and used[15] Desoxyn without a

---

[12] MCL 333.7101 *et seq.*; MSA 14.15(7101) *et seq.*
[13] MCL 333.7407; MSA 14.15(7407) provides in pertinent part:

  (1) A person shall not knowingly or intentionally:

* * *

  (c) Acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge.
  (d) Furnish false or fraudulent material information in, or omit any material information from, an . . . official prescription form . . . .

[14] MCL 333.7403(1); MSA 14.15(7403)(1) provides in pertinent part:

  A person shall not knowingly or intentionally possess a controlled substance, a controlled substance analogue, or an official prescription form or a prescription form unless the controlled substance, controlled substance analogue, official prescription form, or prescription form was obtained directly from, or pursuant to, a valid prescription or order . . . .

[15] MCL 333.7404(1); MSA 14.15(7404)(1) provides in pertinent part:

valid prescription. The significant degree of harm and punishment associated with such violations, as well as the number of times that he committed them, makes his conduct distinguishable from a violation of a safety statute.

Under the controlled substances act, transactions involving controlled substances are almost entirely prohibited. Improper use of a controlled substance on just one occasion can have a substantially detrimental, and possibly even permanent, effect on the health of the user. Illegal possession and use of controlled substances may also produce widespread social loss and lead to further criminal acts. The case of John Orzel stands as a testament to the destruction that can result when the provisions of the controlled substances act are violated.

Illegal acquisition, possession, and use of controlled substances carry heavy punishments. The acquisition of a controlled substance by misrepresentation is a felony;[16] illegal possession of a schedule 1 or 2 controlled substance in an amount less than twenty-five grams of any mixture containing that controlled substance is also a felony;[17] and the illegal use of a controlled substance is a misdemeanor punishable by imprisonment up to one year, or a fine up to $2000, or both.[18] John Orzel's illegal conduct is even more egregious because he violated these provisions not just once, but repeatedly. Because his illegal acts constitute serious

---

A person shall not use a controlled substance or controlled substance analogue unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article.

[16] MCL 333.7407(3); MSA 14.15(7407)(3).
[17] MCL 333.7403(2)(v); MSA 14.15(7403)(2)(v).
[18] MCL 333.7404(2)(a); MSA 14.15(7404)(2)(a).

illegal conduct, application of the wrongful-conduct rule is appropriate in this case.

### C. CAUSATION REQUIREMENT

Another important limitation under the wrongful-conduct rule involves causation. For the wrongful-conduct rule to apply, a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages.

> The maintenance of an action, under the general rule, may be refused or precluded only where the illegality or immorality with which plaintiff is chargeable has a causative connection with the particular transaction out of which the alleged cause of action asserted arose.
>
> The fact that a person has been guilty of a wrong in one particular does not make him an outlaw or forfeit his right to legal protection and relief in regard to others, and does not preclude him from maintaining an action based on a separate transaction, as, where the original wrongdoing is consummated, and unrelated to the later and independent wrongdoing of the defendant . . . .
>
> An action may be maintained where the illegal or immoral act or transaction to which plaintiff is a party is merely incidentally or collaterally connected with the cause of action, and plaintiff can establish his cause of action without showing or having to rely upon such act or transaction although the act or transaction may be important as explanatory of other facts in the case . . . . [1A CJS, Actions, § 30, pp 388-389.]

This Court incorporated the causation requirement into Michigan's wrongful-conduct rule in *Manning*. There, the plaintiff, Mrs. Manning, filed a negligence action against a premises owner after she had fallen into a hole located on the premises,

and suffered injury. Also located on the premises was a church where Mrs. Manning had been engaged in an illegal bingo game. It was after the bingo game had ended, and as she was leaving the premises, that Mrs. Manning fell into the hole. The defendant appeared to have been clearly negligent in its failure to maintain the premises in a reasonably safe condition. Nonetheless, the defendant argued that the plaintiff was not entitled to any recovery because of her participation in the illegal bingo game.

This Court rejected the defendant's argument, explaining that, absent a showing that the plaintiff's illegal conduct was a proximate cause of the plaintiff's injuries, the wrongful-conduct rule could not apply to bar a plaintiff's claim.

> "[The plaintiff's] injury must have been suffered while and as a proximate result of committing an illegal act. The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted." [*Manning* at 136, quoting *Meador v Hotel Grover*, 193 Miss 392, 405-406; 9 So 2d 782 (1942).]

Applying this causation requirement to the facts, the Court concluded that the wrongful-conduct rule did not apply, and that Mrs. Manning could proceed in her negligent action notwithstanding her illegal conduct. The Court emphasized that Mrs. Manning's participation in the illegal bingo game had ended by the time she fell into the hole. Further, the Court indicated that it did not consider the prior illegal bingo game to

have been "a substantial causal factor" with regard to the plaintiff's injuries.[19]

Application of the causation requirement to the facts in the instant case does not lead to the same result as in *Manning.* The plaintiffs do not dispute that the illegal conduct that John Orzel engaged in at the time he dealt with the defendant was at least a proximate cause of his asserted injuries. However, the plaintiffs argue that John Orzel's illegal conduct cannot be considered for purposes of the wrongful-conduct rule because his illegal conduct was excused in that he was insane during the time that he dealt with the defendant. To support their insanity excuse theory, the plaintiffs rely on our opinion in *Ohio State Life Ins Co v Barron,* in which we approved a rule that would allow a plaintiff to pursue a cause of action based in part on a homicide committed by the plaintiff, if the plaintiff was shown to have been legally insane at the time he committed the homicide.

In view of all the facts in this case, we do not find it necessary to decide whether John Orzel was actually legally insane so that he could not be held criminally responsible for his actions. Nor do we find it necessary to determine whether the insanity-excuse exception highlighted in *Ohio State Life Ins* applies to illegal conduct other than homicides for purposes of the wrongful-conduct rule. Proceeding on the assumption that John Orzel did at some point become legally insane, and that such insanity would excuse the illegal acts he committed while insane, we are still able to conclude that his illegal acts, committed *while he was sane,* proximately caused his damages.

Under Michigan negligence jurisprudence, it is

[19] For another application of the causation limitation see *Miller v Radikopf* (finding that the illegal aspect of a contractual relationship was "not an essential part of" the agreement sought to be enforced).

not necessary to show that a party's conduct was "the" proximate cause of the injuries—showing that the party's conduct was "a" proximate cause of the injuries is sufficient. *Dedes v Asch,* 446 Mich 99, 116; 521 NW2d 488 (1994). A review of the facts in this case makes clear that the illegal conduct that John Orzel engaged in while he was sane served as "a" proximate cause of his asserted injuries.

It is uncontested that John Orzel was sane when he first began to illegally purchase and use Desoxyn in November 1980. It was while he was sane that he decided to escalate his purchase and use of Desoxyn. The escalation continued quickly over the next several months, to the point that he became addicted to Desoxyn, and suffered hallucinations, amphetamine psychosis, and eventually, legal insanity. Dr. Griffith testified that it was John Orzel's amphetamine psychosis that precipitated the onset of his paranoid schizophrenia. "[Addiction] to Desoxyn," "hallucinations and mental illness including but not limited to paranoid schizophrenia," and the pain, suffering, and monetary losses resulting from these conditions, comprise the list of the injuries set forth in the plaintiffs' complaint. The chronology of John Orzel's use of Desoxyn while he was sane makes plain that his illegal use during that time was the direct, immediate, and necessarily proximate cause of his addiction to Desoxyn, his hallucinations, and his mental illness—at least to the extent of being considered legally insane. With regard to any further asserted injuries, we find that John Orzel's transactions with Desoxyn while he was sane are necessarily a proximate cause of those injuries as well.

Plaintiffs cannot be heard to argue that the causal relationship between John Orzel's injuries

and his use of Desoxyn while he was sane was too remote or incidental to be considered a proximate cause of his injuries. Under the plaintiffs' insanity theory, John Orzel's excessive use of Desoxyn while he was sane was sufficient to make him legally insane. Furthermore, plaintiffs argue that Orzel's use of Desoxyn while he was insane directly and immediately led to injuries other than addiction, hallucination, and any mental illness beyond legal insanity. In our opinion, these two facts lead to the conclusion that his use of Desoxyn while he was sane was a proximate cause of these injuries. John Orzel's use of Desoxyn while he was sane cannot be characterized as a separate transaction from his use while he was insane, because his initial consumption of the drug inevitably led to this subsequent use while he was insane. Consequently, any injuries that are a direct result of his use while he was insane are also foreseeable consequences of his use while he was sane.

The plaintiffs inadvertently concede the significant causal relationship between John Orzel's use of Desoxyn while he was sane and his injuries insofar as they cannot establish their cause of action without relying on it: John Orzel's use of Desoxyn while he was sane directly and proximately caused the insanity that the plaintiffs insist excuses portions of his illegal conduct, and, in turn, precludes application of the wrongful-conduct rule. In other words, John Orzel's use of Desoxyn while he was sane is an " 'integral and essential part of [the plaintiffs'] case.' " *Manning* at 136. Unlike the illegal bingo game in *Manning,* which merely served as an occasion for the injury asserted, John Orzel's illegal conduct while he was sane serves as a proximate contributing cause of his asserted injuries. In sum, the causation limita-

tion under the wrongful-conduct rule is satisfied by the facts of this case.

### D. DIFFERENT DEGREES OF CULPABILITY

An exception to the wrongful-conduct rule may apply where both the plaintiff and defendant have engaged in illegal conduct, but the parties do not stand in pari delicti. In other words, even though a plaintiff has engaged in serious illegal conduct and the illegal conduct has proximately caused the plaintiff's injuries, a plaintiff may still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries, such as where the plaintiff has acted " 'under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age . . . .' " *Pantely* at 775, quoting 1 Story, Equity Jurisprudence (14th ed), § 423, pp 399-400. See also 1A CJS, Actions, § 29, pp 386-388.

It is undisputed that both John Orzel and the defendant engaged in wrongful conduct. John Orzel's conduct was wrongful because he repeatedly made misrepresentations to doctors in order to obtain prescriptions for Desoxyn, he repeatedly presented prescriptions to be filled when they were written on the basis of such misrepresentations, he repeatedly presented prescriptions to be filled when they were written for persons with names other than his own, and he repeatedly purchased and used Desoxyn that he obtained pursuant to the false prescriptions. The defendant filled many Desoxyn prescriptions for John Orzel, and, when it did, its conduct was seriously blameworthy. The defendant filled Desoxyn prescriptions for John Orzel without first confirming his identity, it filled the prescriptions too frequently, and it filled them for arguably illegitimate purposes.

In comparing John Orzel's wrongful conduct
with the defendant's wrongful conduct, we con-
clude that the two wrongdoers are equally at fault.
Both parties played pivotal roles in making the
illegal acts possible, and we cannot say that one
party is more guilty than the other. While the
plaintiffs argue that John Orzel's culpability is less
than the defendant's because of his alleged disabil-
ity, we are not convinced. Even if we were to
accept the plaintiffs' characterization of John Or-
zel's status as legally insane, that status does not
prompt application of the culpability exception in
this case because it was John Orzel who, by his
continuous illegal use of Desoxyn, caused himself
to become both addicted and insane. Certainly, we
regard his status as a tragedy. However, because
John Orzel is ultimately responsible for causing
any "great inequality of condition" in the first
place, we conclude it would be inappropriate to
apply the culpability exception under these facts.

### E. STATUTORY BASIS FOR RECOVERY

The final relevant exception to the wrongful-
conduct rule involves where the statute that the
plaintiff alleges the defendant violated allows the
plaintiff to recover for injuries suffered because of
the violation. Statutes that permit certain classes
of persons to recover do so either explicitly or
implicitly. Where a statute explicitly authorizes
persons similarly situated as the plaintiff to re-
cover, then a problem does not arise, and the
courts will simply permit the plaintiff to pursue
his cause of action. Where the statute is silent
regarding recovery, courts are left to infer
whether the Legislature clearly intended persons
similarly situated as the plaintiff to be entitled to
seek recovery.

To determine whether a statute implies recovery for certain types of plaintiffs, courts often apply a test from the Second Restatement of Torts. The test has been referred to as the "statutory purpose doctrine."[20]

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results. [2 Restatement Torts, 2d, § 286, p 25.]

In *Longstreth,* we applied the statutory purpose doctrine to conclude that the particular plaintiffs were entitled to pursue a recovery for injuries resulting from the defendant's violation of a statute. A minor died in an automobile accident after consuming alcohol at a private wedding reception. The minor's parents filed an action against the social hosts, claiming that they had negligently violated § 33 of the Liquor Control Act,[21] which prohibits furnishing alcohol to minors. Section 33

---

[20] See 57A Am Jur 2d, Negligence, § 765, p 682.

[21] MCL 436.1 *et seq.*; MSA 18.971 *et seq.* Section 33 of the Michigan Liquor Control Act provides in pertinent part:

> Alcoholic liquor shall not be sold or furnished to a person unless the person has attained 21 years of age. A person who knowingly sells or furnishes alcoholic liquor to a person who is less than 21 years of age, or who fails to make diligent inquiry as to whether the person is less than 21 years of age, is guilty of a misdemeanor. [MCL 436.33(1); MSA 18.1004(1).]

was a penal statute and did not specifically indicate whether a violation of its provisions would entitle certain injured persons to civil remedies. A majority of this Court held that minors, or their representatives, were entitled to seek recovery from social hosts when the social hosts violated § 33 and caused the minors to suffer injury.

The decisive factor in the majority's analysis was its determination that a minor "clearly falls within the class of persons which [§ 33 of the Liquor Control Act] intends to protect." *Longstreth* at 696. To make this determination, the majority examined the legislative history and public policy surrounding § 33. The majority considered as significant the fact that both the Legislature (through § 33) and the people (through Const 1963, art 4, § 40)[22] had specifically and consistently excepted minors from persons legally entitled to drink alcohol. These actions demonstrated that both the Legislature and the people unequivocally believed that minors were unable to protect themselves from the effects of alcohol, and intended legislation that would specifically so protect them. Given this strong showing of legislative and popular intent, the majority was able to decide that minors "clearly" fell within the class of persons that § 33 was designed to protect. Having also found that all the other factors under the statutory purpose doctrine had been satisfied, it concluded that underage plaintiffs, or their representatives, could seek civil remedies for violations of § 33.

When we apply the statutory purpose doctrine in the instant case, we are unable to similarly

_____

[22] Const 1963, art 4, § 40 provides in pertinent part:

A person shall not sell or give any alcoholic beverage to any person who has not reached the age of 21 . . . .

conclude that the plaintiffs are entitled to pursue civil remedies for the alleged statutory violations. The plaintiffs base their negligence claim in part on the defendant's alleged violation of provisions of the Public Health Code[23] that address pharmacists' duties regarding controlled substances. Specifically, the plaintiffs claim that the defendant violated MCL 333.17759; MSA 14.15(17759) when it allegedly failed to maintain records of the prescription drugs it dispensed to John Orzel,[24] and that it violated MCL 333.16221(c)(iv); MSA 14.15(16221)(c)(iv) when it allegedly dispensed Desoxyn for illegitimate purposes.[25] The plaintiffs claim that they are entitled to a recovery for such violations.

The plaintiffs further argue that recent amendments of health code provisions dealing with pharmacists demonstrate the Legislature's policy determination that plaintiffs like John Orzel are entitled to a civil remedy from a pharmacist for such violations. The amendments of MCL 333.17763; MSA 14.15(17763) and MCL 333.17768(1); MSA 14.15(17768)(1)[26] expand the types of penalties that health professional disciplinary subcommittees can

---

[23] MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*

[24] MCL 333.17759; MSA 14.15(17759) provides in pertinent part:

> (1) A harmful drug shall be dispensed only:
> (a) As a prescription drug.
> (b) Under the control of a licensed pharmacist or prescriber, who maintains records for the dispensing of these drugs which are the same as records required for the dispensing of prescriptions.

[25] Actually, MCL 333.16221(c)(iv); MSA 14.15(16221)(c)(iv) does not apply to pharmacists. See MCL 333.16111(1); MSA 14.15(16111)(1). However, a prohibition against dispensing controlled substances for illegitimate purposes does exist with regard to pharmacists pursuant to MCL 333.7311(1)(e) and (g); MSA 14.15(7311)(1)(e) and (g).

[26] The amendments were incorporated into the health code pursuant to 1993 PA 79, § 3, effective April 1, 1994. The wording of the amendments essentially is the same under the two provisions. For

impose on licensed health care professionals who violate certain provisions of the health code, including allowing a subcommittee to "order restitution."

We find that the instant plaintiffs are not entitled to a recovery because we are not convinced that plaintiffs like John Orzel "clearly" fall within the class of persons that the allegedly violated statutes were devised to protect. In contrast to the consistent and affirmative evidence in *Longstreth* showing that both the Legislature and the people intended to include the minor plaintiffs within the protected class, we have found no evidence to suggest that the Legislature intended to confer special protection on persons like John Orzel, who repeatedly and fraudulently engage in the illicit use of drugs. Nor does the overall legislative scheme indicate that the Legislature would have intended recovery for such persons. One of the primary purposes of these provisions is to prevent the illegal possession and use of controlled substances. This purpose would be inherently subverted if the courts permitted relief to illicit drug users like John Orzel. To allow plaintiffs like him to recover would in effect sanction illegal possession and use of controlled substances—and that this Court simply cannot do.

---

convenience, only the wording of the amendment under MCL 333.17768(1); MSA 14.15(17768)(1) is quoted here.

> In a manner consistent with part 161, the disciplinary subcommittee may fine, reprimand, or place on probation, a person licensed under this part, or deny, limit, suspend, or revoke a person's license *or order restitution* or community service for a violation of this part or rules promulgated under this part. [Emphasis added.]

Note that the amendment providing for restitution was also incorporated into the controlled substances act under MCL 333.7311(1); MSA 14.15(7311)(1).

We have not been persuaded to find otherwise on the basis of the newly instituted "restitution" penalty permitted against pharmacists under MCL 333.17763; MSA 14.15(17763) and MCL 333.17768(1); MSA 14.15(17768)(1). The provisions are limited in scope to penalties that may be imposed by a disciplinary subcommittee—not a trial court. This aspect of the provisions shows that the Legislature did not have in mind a malpractice award or judgment or settlement stemming from a civil cause of action for damages when it authorized subcommittees to order "restitution."

The legislative history supports this understanding, and provides further instruction concerning the Legislature's aim when it enacted the amendments. We again find nothing in the legislative history to suggest that the Legislature wanted to make illicit drug users the recipients of restitution from pharmacists who illegally dispense prescription drugs.[27] Nor do the legislative analysis documents indicate that the Legislature considered restitution for illicit users to be a necessary and effective means of preventing illegal diversion of controlled substances. Significantly, the documents do explain that the Legislature had already instituted a specific response to the problem of illegal diversion of prescription drugs. The response came in the form of a legislation package known as the "triplicate prescription" program, under which the dispensers and prescribers of controlled substances are required to maintain triplicate records regarding the dispensing or prescription of controlled

---

[27] See HB 4076, Second Analysis, House Legislative Analysis (January 25, 1994), HB 4076, First Analysis, House Legislative Analysis (March 24, 1993), and SB 337-343, First Analysis, Senate Fiscal Analysis (February 24, 1993).

substances.[28] The Legislature has the authority to institute a policy that would allow illegal drug users to sue their illegal drug suppliers for negligence. The Legislature has not yet established such a policy, and this Court will refrain from superimposing such a policy judgment on the statutes.[29]

Because John Orzel fails to meet the threshold requirement for recovery under statutes the defendant allegedly violated—he does not clearly fall within the class of persons that the statutes were intended to protect—we conclude that the statute-based exception to the wrongful-conduct rule does not apply in this case. However, we want to point out that merely because plaintiffs like John Orzel are not entitled to a recovery under the statutes does not mean that pharmacists who violate such statutes in connection with illicit drug users are

[28] HB 4076, Second Analysis, House Legislative Analysis, fiscal implications, p 13 (January 25, 1994). For provisions regarding the triplicate prescription see MCL 333.7334(7); MSA 14.15(7334)(7), MCL 333.7334(15); MSA 14.15(7334)(15).

[29] The plaintiffs regard as significant the fact that the Legislature did not explicitly exclude illicit drug users from those entitled to restitution under the amendments. The plaintiffs point to the explicit exclusion from recovery applying to the "visibly intoxicated person" under the dramshop act, MCL 436.22(10); MSA 18.993(10), as proof that the Legislature knew how to exclude certain groups from recovery when it so desired. They argue that the fact that the Legislature did not similarly limit the recovery class under the amendments shows that no such limitation was intended.

The plaintiffs' analogy to the dramshop act is without merit. The Legislature is presumed to know the recognized rules of the common law in effect when it drafts statutes. *In re Recorder's Court Bar Ass'n v Wayne Circuit Court,* 443 Mich 110, 127; 503 NW2d 885 (1993). When the Legislature drafted the amendments providing for restitution, the wrongful-conduct rule was firmly embedded in our common-law jurisprudence. Under the wrongful-conduct rule, illicit drug users would be barred from restitution where their actions were based in part on their illegal transactions with drugs. Absent an indication that the Legislature sought to abrogate the common law when it drafted the amendments, the amendments will be read in light of the previously established wrongful-conduct rule, so as to necessarily exclude illicit drug users from those persons who would be entitled to restitution under the amendments.

immune from all forms of punishment. The Legislature has taken steps to assure that punishment will occur when warranted. These provisions are penal in nature, and any licensed health professional found to have violated them will be subject to discipline by the pharmacy licensing board or will be subject to criminal prosecution. Clearly, the law will not tolerate pharmacists who abdicate their professional responsibilities and permit themselves to be used as conduits through which controlled substances can be made available to the illicit drug market.

## IV. CONCLUSION

Because none of the limitations or exceptions to the wrongful-conduct rule apply, we hold that plaintiffs' claim is barred since it is based, at least in part, on John Orzel's illegal conduct. Because the claims of John Orzel's relatives are also based in part on his illegal conduct, we hold that their claims likewise are barred under the wrongful-conduct rule.

The decision of the Court of Appeals is reversed, and the trial court's decision to grant the defendant judgment notwithstanding the verdict is affirmed.

BRICKLEY, C.J., and LEVIN, BOYLE, RILEY, MALLETT, and WEAVER, JJ., concurred with CAVANAGH, J.