*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WOMEN'S INTEGRATED HEALTH CARE, PC,

Plaintiff/Counterdefendant-Appellant,

v

KEITH A HESLINGER, M.D.,

Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
December 18, 2024
9:17 AM

No. 367671
Genesee Circuit Court
LC No. 21-115494-CB

Before: O'BRIEN, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

In this employment action, plaintiff/counterdefendant Women's Integrated Health Care, PC (WIHC) appeals by leave granted[1] the trial court order denying its motion for summary disposition under MCR 2.116(C)(9) and (10). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

WIHC is a medical practice with offices in Grand Blanc, Clarkston, Fenton, and Davison, Michigan. WIHC was formed in January 2000 by Thomas Wright, D.O., Theodore Fellenbaum, M.D., Bonita Wang, D.O., and defendant/counterplaintiff Keith Heslinger, M.D. The founding members obtained a loan to fund the practice, and they each personally guaranteed the obligations on the loan.

Heslinger was employed to provide medical services to WIHC's patients. His employment was governed by an employment agreement,[2] wherein he agreed "that his service to [WIHC]'s patients will be consistent with the rules and regulations promulgated by [WIHC], the State licensing authority and any and all hospitals with which [WIHC] may be affiliated." Heslinger

---

[1] *Women's Integrated Health Care PC v Heslinger*, unpublished order of the Court of Appeals, entered February 15, 2024 (Docket No. 367671).

[2] The initial agreement was effective January 1, 2000, and was amended in July 2001.

expressly acknowledged that "he may be relieved from servicing patients" if he failed to perform services in accordance with the terms of the agreement. The agreement specified that Heslinger could be terminated for cause for a number of events, including the following:

> A. [Heslinger] has been convicted of a felony of any kind, a misdemeanor related to the practice of medicine, or has acted dishonestly with regard to [WIHC] or [WIHC]'s patients.
>
> B. A material breach of this Agreement by [Heslinger], including, for example, [Heslinger]'s failure to perform duties under this Agreement.
>
> C. Suspension or any other disciplinary action by any duly constituted professional authority involving ethics or performance applicable to medical doctors within the State of Michigan and a revocation of rights at hospitals with which [WIHC] has and continues to have a rights relationship. . . .

WIHC's bylaws establish that it shall be managed and controlled by a four-member board of directors, who need not be shareholders. The bylaws state that each director shall hold office until either the next annual shareholders' meeting or the election of a successor. But the bylaws authorize "the removal of any Director of [WIHC] for any cause . . . ." The bylaws dictate that the board of directors shall elect officers, including a president, a secretary, and a treasurer. The bylaws authorize the board of directors to remove an officer "whenever in the judgment of the Board the business interests of [WIHC] will be served; provided, however, that the removal shall be without prejudice to the contract rights, if any, of the person removed."

The bylaws dictate that WIHC's president, subject to the control of the board of directors, "shall have charge of the active management of [WIHC's] business operations, with such powers and duties of supervision and management as are usually vested in the office of president of a corporation and . . . such other powers and duties as may be assigned to the president by the Board of Directors." The bylaws also state that the president shall be the chairman of the board and chief executive officer of WIHC. "Subject to the control of the Board of Directors, the Chairman may have the authority to oversee the general management of [WIHC] . . . ." At all times relevant, Wright was president of WIHC and Heslinger was the treasurer.

In August 2005, Heslinger was issued 1,000 shares of WIHC's nonassessable capital stock. At that time, there were five stockholders, including Heslinger, and each owned 1,000 shares of WIHC's 5,000 shares of nonassessable capital stock.[3] If a stockholder's employment with WIHC is terminated for any reason, the stockholders' agreement states that WIHC "shall purchase from the Stockholder . . . all of [WIHC's] stock owned by the person at a price provided" in the agreement. The stockholders' agreement provides different buy-back provisions depending on whether a stockholder's employment was terminated voluntarily or involuntarily. If termination of employment was voluntary, the purchase price for the stock is 100% of the price as determined

---

[3] In addition to the four initial founding members, Martin Lapa, D.O. was a stockholder.

by a formula stated in the agreement divided by the number of shares outstanding.[4] However, the stockholders may "determine by resolution at an annual or special meeting, the Price of a share of stock in the Corporation[,]" which would be effective for twelve months following the date of that determination. If a stockholder's employment is involuntarily terminated, the purchase price is 25% of the purchase price either determined by the formula or through a stockholders' resolution.[5]

From June 2016 through August 2020, Heslinger signed over 195 blank prescription forms at the request of his medical assistant under the representation that the prescriptions would be completed for WIHC patients. The medical assistant used those prescriptions to obtain oxycodone and other opioids. To avoid detection, the medical assistant used the names of other medical assistants in the practice with their consent, and they delivered the drugs to her in exchange for reimbursement of their prescription costs and/or insurance copays. Ascension Pharmacy filled most of the prescriptions and dispensed approximately 12,400 tablets of controlled substances under the fraudulent prescriptions.

On August 31, 2020, the medical assistant told Heslinger that she had an opioid-use problem and had been using the blank prescription forms to obtain the drugs. On that same day, WIHC's office manager was informed of the situation. The office manager reported the matter to Wright, who was the president of WIHC. The following day, Lapa informed Heslinger and Wright that the Michigan Automated Prescription System (MAPS), which tracks controlled substances, reflected that the opioid prescriptions were issued to five of WIHC's medical assistants and dated back several years. On that same day, the office manager reported the matter to the police.

On September 3, 2020, WIHC's board of directors met for its regularly scheduled business meeting. WIHC's three board members/shareholders—Wright, Lapa, Heslinger[6]—attended the meeting. The meeting also included three persons who were not board members or shareholders— WIHC's office manager, WIHC's lawyer, and a WIHC doctor. Wright explained that signing blank prescriptions and redirecting narcotics was a dismissible offense. According to Wright,

---

[4] The stockholders' agreement formula

> is adjusted net book value defined as: net book value less estimated uncollectible portion of receivables and plus additional practice goodwill[,]" which "is 40% of the average of one-half the weighted average (5-3-1) of the company's gross revenues for the prior three fiscal years and the weighted average (5-3-1) of the compensation and benefits of the doctors/shareholders for the prior three fiscal years, plus the estimated physician discretionary expenses of the Doctor/Shareholders for those prior three fiscal years. These determinations shall be made by the certified public account then servicing [sic] as the accountant for [WIHC] and shall be made in accordance with sound and accepted accounting principles and practices consistently applied.

[5] Regardless of the reason for termination, "[a]ny and all sales with respect to the terminated employee shall be made contemporaneously and consummated within sixty (60) days after of the termination of employment . . . ."

[6] Lapa was the secretary of WIHC.

Heslinger agreed that he had breached his responsibilities to the practice. It was discussed that Ascension Health would conduct an investigation into the prescription matter and Wright would sit in on the interviews with the investigators. Heslinger recalled that there was also a discussion whether he should be placed on administrative leave during the investigation, but it was determined that it was not needed at that time. However, Wright did not recall ever discussing placing Heslinger on administrative leave.

On that same day, Ascension and Genesys investigators interviewed the medical assistants, individually, with Wright in attendance. After those interviews, Wright, as the president of WIHC, terminated the employment of all the medical assistants, including the one that orchestrated the scheme. He reasoned that, in addition to the breach of trust, the medical assistants had exposed WIHC to liability for insurance fraud by using their insurance to obtain the drugs. Wright did not consult with the partners before making the decision to terminate the medical assistants.

Based on the information obtained through the meetings with the medical assistants, Wright decided, as the president of WIHC, to terminate Heslinger's employment. Later than afternoon, Heslinger received a text message from Wright that there would be a meeting at 5:00 p.m. Heslinger asked what the meeting would be about, but was told that he would find out when he got there. Wright maintained that he and Heslinger agreed at the morning meeting to meet again in the afternoon to discuss the matter further. Wright did not discuss his decision with Lapa when he made it. Rather, Wright believed that he owed it to Heslinger, as a friend, to have a personal conversation with him first to tell him that his employment was being terminated. Wright recalled Heslinger did not contest his termination and expressed that he understood that termination was necessary. Wright maintained that he did not consult WIHC's bylaws regarding termination because the situation warranted immediate termination. Heslinger recalled that Wright told him that he was being fired because of the insurance fraud issue and that his role in signing the blank prescriptions could result in the loss of his medical license. Heslinger maintained that Wright told him that it would all be explained by WIHC's lawyer when they reconvened for their meeting at 5:00 p.m.

After Wright's conversation with Heslinger, Wright and Heslinger met with Lapa and WIHC's lawyer. At that meeting, Heslinger was told that he was fired. According to Heslinger, the reasons that were given were essentially the same reasons previously explained by Wright. Heslinger did not believe the termination decision needed to be made before the investigation was complete. Although Heslinger did not agree with the decision, he remembered that he told the meeting attendees that he understood the decision. Wright assumed that, once terminated, Heslinger was no longer a partner or a board member in the practice. WIHC did not buy back Heslinger's shares of WIHC stock after his termination.

In October 2020, Ascension notified the Bureau of Professional Licensing (the Bureau) of Heslinger's role in the medical assistants' prescription scheme and alerted the Drug Enforcement Agency. In June 2021, the Bureau filed a complaint against Heslinger, alleging violations of MCL

333.16221(a), (b)(i), and (w).[7] The Bureau indicated that, from approximately June 2016 through August 2020, Heslinger's medical assistant fraudulently obtained over 200 prescriptions for controlled substances by asking Heslinger to sign blank prescriptions. During the investigation, Heslinger admitted that he did not obtain and review MAPS reports for his patients before prescribing the controlled substances. Based on Heslinger's no contest plea to the allegations of fact and law in the complaint, the Bureau found that Heslinger violated MCL 333.16221(a), (b)(*i*), (w), and MCL 333.7303a(4).[8] The Bureau issued a consent order reprimanding Heslinger and fining him $3,000.00.

Following Heslinger's termination, the parties disputed the valuation of his shares of stock, his liability for shareholder loans, and whether his subsequent employment violated the noncompetition covenants in his employment agreement. WIHC filed this action seeking a declaration that it had terminated Heslinger's employment for just cause and that Heslinger's shares of stock were redeemable for 25% of their value. WIHC also sought an injunction prohibiting Heslinger from violating the terms of his noncompete agreement. In addition, WIHC asserted claims for breach of fiduciary duty, breach of contract, and claimed Heslinger was indebted to WIHC in the amount of $68,673.00 for shareholder loans. Heslinger counterclaimed seeking declaratory relief and monetary damages for interference with the shareholders' interests, breach of the stockholders' agreement, and breach of fiduciary duty. Heslinger claimed that the September 3, 2020 meeting violated the corporate bylaws by failing to give proper notice and thus all decisions at that meeting should be invalidated.

Following discovery, WIHC moved for summary disposition under MCR 2.116(C)(9) and (10), arguing that there was no genuine issue of material fact that it terminated Heslinger for good

---

[7] At the time, MCL 333.16221, as amended by 2017 PA 249, provided that the Bureau shall investigate any allegation that grounds for disciplinary subcommittee action exist, including the following grounds:

> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.
>
> (b) Personal disqualifications, consisting of 1 or more of the following:
>
> (*i*) Incompetence.
>
> *   *   *
>
> (w) A violation of section [MCL 333.7303a(4) or (5)]. . . .

[8] Heslinger stipulated that he was not admitting the truth of the allegations in the complaint—he was only pleading no contest for the purposes of waiving his right to a defense and allowing the disciplinary subcommittee to enter an order.

cause because his violations of law and ethics comprised a material breach of the contract.[9] WIHC maintained that Heslinger breached his fiduciary obligations to the practice. WIHC also contended that Heslinger had not rebutted WIHC's account stated claim for $68,673.00. WIHC further argued that the doctrines of unclean hands, wrongful conduct, and/or first material breach barred Heslinger's counterclaims. WIHC asserted that Heslinger is, at most, entitled to 25% of the value of his shares of stock before setoffs.[10] In response, Heslinger claimed that the September 3, 2020 meeting violated the corporate bylaws by failing to give proper notice and thus all decisions at that meeting should be invalidated. Heslinger further argued that his liability on the shareholder loan, if any, was to the lender, and only if WIHC defaulted on the loan.

The trial court concluded that there were genuine issues of material fact whether there was good cause for Heslinger's termination, whether WIHC's actions were taken in haste, and whether WIHC was entitled to a setoff from the value of Heslinger's shares of stock on the basis of the account stated portion of its claim. The court entered an order denying WIHC's motion for the reasons stated on the record. WIHC moved for rehearing or reconsideration, which the trial court denied. WIHC sought leave to appeal. This Court granted leave limited to the issues raised in the application and supporting brief.[11]

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). The interpretation of a contract is a question of law that we also review de novo. *DaimlerChrysler Corp v G Tech Prof Staffing, Inc*, 260 Mich App 183, 184; 678 NW2d 647 (2003). Likewise, application of Michigan's wrongful-conduct rule presents a question of law that we review de novo. See *Daniel v Dept of Corrections*, 468 Mich 34, 40; 658 NW2d 144 (2003).

Summary disposition under MCR 2.116(C)(10) is warranted when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is

---

[9] Although its complaint only cited Heslinger's role in the medical assistants' prescription scheme as just cause for Heslinger's termination, WIHC claimed in its motion that Heslinger's termination was further warranted based on his unethical romantic relationship with a patient and his improper use of company resources to pay for various things associated with that relationship. But Wright testified that he terminated Heslinger because of his "breach in responsibilities" by signing blank prescriptions for a five-year period without verifying what prescriptions were being written. Wright further testified that he made the decision, as president of WIHC, not to terminate Heslinger regarding his unethical relationship with a patient. Thus, Heslinger's alleged unethical relationship with a patient is not relevant to the just cause issue.

[10] In addition, Heslinger moved for partial summary disposition on counts II, II and IV of his counterclaim, which the trial court denied. Heslinger did not seek leave to appeal that interlocutory order. The trial court's denial of that motion is not within the scope of this appeal, which is limited to the issues raised in WIHC's application.

[11] *Women's Integrated Health Care PC v Heslinger*, unpublished order of the Court of Appeals, entered February 15, 2024 (Docket No. 367671).

entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary disposition under MCR 2.116(C)(10), we must consider the evidence submitted by the parties in the light most favorable to the nonmoving party. *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.* (cleaned up). If there is a genuine issue of material fact, dismissal is inappropriate. *Id.* But summary disposition under MCR 2.116(C)(10) is proper when, after considering all evidence in the light most favorable to the nonmoving party, the court determines there is no genuine issue of material fact. *Id.*

## III. JUST CAUSE

WIHC argues that the trial court erred by finding that there was a genuine issue of material fact whether WIHC had just cause for terminating Heslinger's employment. We agree.

"In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *Phillips v Homer*, 480 Mich 19, 24; 745 NW2d 754 (2008) (cleaned up). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Id.*

Heslinger admitted at his deposition that he signed the blank prescription forms, which he conceded violated the state licensing authority's rules and regulations as well as his ethical obligations as a physician. He also admitted that he did not review the patients' charts to verify the drugs he had prescribed or look on MAPS, which would have shown that his prescriptions were for opioids for his medical assistants. Heslinger further admitted that, as a physician, it was his responsibility to review and sign his patients' charts to ensure the charts were accurate. But Heslinger contends that it was not appropriate to discharge him on September 3, 2020 without complying with the mandates in the corporate bylaws and stockholders' agreement.

The terms of Heslinger's employment agreement required him to service WIHC's patients "consistent with the rules and regulations promulgated by [WIHC], the State licensing authority and any and all hospitals with which [WIHC] may be affiliated." The parties' employment agreement states that WIHC could terminate Heslinger for just cause, which included where he acted dishonestly regarding WIHC or WIHC's patients, he materially breached the employment agreement, or he became subject to disciplinary action under the principles governing medical doctors in Michigan and his hospital rights were revoked. It is undisputed that Heslinger was reprimanded and fined by the Bureau, which is clearly "disciplinary action." However, none of his hospital privileges were revoked. Moreover, the disciplinary action occurred on May 18, 2022, which was more than 20 months *after* Heslinger was terminated. Although Heslinger's subsequent disciplinary action was not just cause to terminate Heslinger on September 3, 2020, there is no genuine issue of material fact that his violations of the state licensing authority's rules and regulations were a material breach of the employment agreement.

On appeal, Heslinger does not assert any arguments challenging whether there was just cause for his termination as an employee of WIHC. Instead, he contends that his removal as a shareholder and director during the September 3, 2020 board of directors meeting breached the corporate bylaws and shareholders' agreement because proper notice of the meeting was not given.

He also argues that Wright and Lapa breached their fiduciary duties owed to Heslinger as a shareholder of WIHC. These arguments are directly related to the merits of Heslinger's counterclaims, which are not before this Court. As Heslinger recognizes, the trial court concluded that there were material questions of fact whether Heslinger's termination and removal as a shareholder and director "were taken a little bit in haste [and] whether or not there is any remedy for that."

We conclude that the trial court erred by not entering a declaratory judgment on the issue whether there was just cause to terminate Heslinger's employment. However, our decision does not impact the trial court's conclusion regarding Heslinger's counterclaims, or its determination that there are material factual disputes regarding the redemption value of Heslinger's shares of WIHC stock, WIHC's claim for payment of the shareholder loan, and WIHC's alleged damages. WIHC declared in its application for leave to appeal that "the issues of damages and valuation of Heslinger's shares" were for the trier of fact to determine. Because WIHC did not contest those issues, they are not before this Court. And because WIHC's statement of questions presented did not address the merits of Heslinger's counterclaims or WIHC's claim for payment of the shareholder loan, those issues are waived for purposes of this appeal. See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019); see also MCR 7.212(C)(5) (stating that an appellant's brief must contain "[a] statement of questions involved, stating concisely and without repetition the questions involved in the appeal.").[12]

## IV. HESLINGER'S COUNTERCLAIMS

WIHC further argues that Heslinger's counterclaims are barred by the wrongful-conduct rule, the unclean-hands doctrine, and/or his first material breach of the stockholders' agreement, his employment agreement, and his fiduciary obligations. We disagree.

Heslinger's counterclaim seeks declaratory relief and monetary damages for interference with the shareholders' interests, breach of the stockholders' agreement, and breach of fiduciary duty. Heslinger claimed that the September 3, 2020 meeting violated the corporate bylaws by failing to give proper notice and thus all decisions at that meeting should be declared invalid. Heslinger maintained that he was entitled to 100% of the value of his stocks and other monetary damages.

"The wrongful-conduct rule provides that when a plaintiff's action is based, in whole or in part, on his own illegal conduct, his claim is generally barred." *Hashem v Les Stanford Oldsmobile, Inc*, 266 Mich App 61, 89; 697 NW2d 558 (2005) (cleaned up). However, "[t]he mere fact that a plaintiff engaged in illegal conduct at the time of his injury does not mean that his claim is automatically barred under the wrongful-conduct rule. To implicate the wrongful-conduct rule, the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute." *Orzel v Scott Drug Co*, 449 Mich 550, 561; 537 NW2d 208 (1995). Moreover,

---

[12] Neither of the parties discussed the noncompete agreement at the motion hearing or in their briefs on appeal. The noncompete agreement also was not addressed by the trial court. Because WIHC did not address the noncompete agreement in its application for leave to appeal or its brief on appeal, the issue is waived. See *Seifeddine*, 327 Mich App at 521; see also MCR 7.212(C)(5).

"a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages." *Id*. at 564. The *Orzel* Court explained:

> "[The plaintiff's] injury must have been suffered while and as a proximate result of committing an illegal act. The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. Where the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted." [*Id*. at 565 (alteration in original), quoting *Manning v Bishop of Marquette*, 345 Mich 130, 136; 76 NW2d 75 (1956).]

WIHC asserts that Heslinger violated MCL 333.16221(a) (stating that the violation of a general duty is a ground for disciplinary action), (b)(*i*) (stating that incompetence is a ground for disciplinary action), (w) (stating that a violation of MCL 333.7303a(4) or (5) can constitute grounds for a disciplinary action), and MCL 333.7303a(4) (addressing a physician's duty to review MAPS before making prescriptions after June 1, 2018).[13] Although Heslinger pleaded no contest to the allegations in the Bureau complaint, he has not admitted that he violated any of these statutory provisions. Regardless, none of these statutory provisions provide criminal penalties for their violation; rather, each provision merely provides grounds for disciplinary action. The Bureau reprimanded Heslinger and fined him $3,000 for his violations based on his no contest plea. Heslinger's medical license was not suspended or revoked.

Moreover, Heslinger has not been criminally charged for writing blank prescriptions. Nonetheless, WIHC relies on MCL 333.7407 and MCL 333.7303a, claiming "[e]ach prescription was also a separate criminal act." Under MCL 333.7407, it is a felony to distribute a schedule 1 or 2 controlled substance without a proper prescription form, use an improper license number in the manufacture or distribution of a controlled substance, obtain a controlled substance by fraud, falsify documents or records relating to controlled substances, do anything that would render a drug a counterfeit substance, or possess a counterfeit prescription form. There have been no allegations or findings that Heslinger committed any of these actions. Further, as discussed, MCL 333.7303a does not provide criminal penalties; rather, it merely provides grounds for disciplinary action.

WIHC also relies on 21 CFR § 1306.05(a) (holding prescribing practitioner responsible for prescriptions prepared by a secretary or agent for the practitioner's signature if the prescription does not conform in all essential respects to the law and regulations). But this federal regulation does not set forth any criminal penalties.

Finally, WIHC relies on 21 USC 841(a)(1) (prohibiting the knowing or intentional manufacture, distribution, dispensation, or possession with intent to manufacture, distribute or dispense a controlled substance) and 21 USC 843(a)(3) (prohibiting the knowing or intentional acquisition of a controlled substance by fraud), which provide both civil and criminal penalties.

---

[13] MCL 333.7303a(4) requires a licensed prescriber to obtain and review a MAPS report "before prescribing or dispensing to a patient a controlled substance in a quantity that exceeds a 3-day supply[.]"

The crimes stated in these federal statutes are specific intent crimes. It is undisputed that Heslinger was unaware of the medical assistants' prescription scheme.

WIHC has not shown that Heslinger violated any criminal statutes as a matter of law, and the disciplinary action taken by the Bureau is not sufficiently serious to warrant application of the wrongful-conduct rule. See *Orzel*, 449 Mich at 561 (stating "where the plaintiff's illegal act only amounts to a violation of a safety statute, such as traffic and speed laws or requirements for a safe work place, the plaintiff's act, while illegal, does not rise to the level of serious misconduct sufficient to bar a cause of action by application of the wrongful-conduct rule.").

WIHC further argues that Heslinger's counterclaims for breach of the stockholders' agreement and breach of fiduciary duty are barred by the first-material-breach doctrine. "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (cleaned up). But this rule only applies when the initial breach is substantial. *Id*. "In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably expected to receive." *Omnicom of Mich v Giannetti Investment Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997). "Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the willfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract." *Id*. Another consideration is the implied covenant of good faith and fair dealing, which is an agreement that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v United of Oakland, Inc*, 193 Mich App 146, 151-152; 483 NW2d 652 (1992).

WIHC's reliance on the first-material-breach doctrine is misplaced. WIHC's bylaws state that the removal of an officer by the board of director is without prejudice to any contractual rights of the person removed. Further, Heslinger's counterclaims for breach of the stockholders' agreement and breach of fiduciary duty seek compensation for his 1,000 shares of WIHC stock. Regardless of Heslinger's conduct that resulted in his termination, WIHC does not dispute that Heslinger is entitled to compensation for his shares of stock. In fact, WIHC initiated this action seeking a declaration that Heslinger's "stock is redeemable under Section 3(c) of the Stockholders' Agreement . . . which requires [WIHC] to pay [Heslinger] 25% of the value of [his] shares" before setoffs for any amounts owed on shareholder loans and other damages. And WIHC acknowledges on appeal that the stockholders' agreement unambiguously states that the purchase price for the stock of an involuntarily terminated employee is 25% of the purchase price stated in the agreement.

Finally, WIHC argues that Heslinger's counterclaim for breach of fiduciary duty is barred by the clean-hands doctrine. "It is well settled that one who seeks equitable relief must do so with clean hands." *Attorney General v PowerPick Player's Club of Mich, LLC*, 287 Mich App 13, 52; 783 NW2d 515 (2010). The clean-hands doctrine is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [opposing party]," and is only relevant to equitable actions or defenses. *Rose v Nat'l Auction Group*, 466 Mich 453, 463,

468; 646 NW2d 455 (2002) (cleaned up). Moreover, to bar relief under the clean-hands doctrine, the misconduct of the party seeking relief "must bear a more or less direct relation to the transaction concerning which complaint is made." *McFerren v B & B Investment Group*, 253 Mich App 517, 524; 655 NW2d 779 (2002) (cleaned up). Heslinger's counterclaim for breach of fiduciary duty asserts that WIHC took action in violation of the bylaws and seeks compensation for his 1,000 shares of WIHC stock. WIHC does not dispute that Heslinger is entitled to compensation for his shares of stock. Further, regardless of Heslinger's conduct that resulted in his termination, he retained any contractual rights that he may have had.[14] The clean-hands doctrine is not applicable here.

## V. CONCLUSION

We affirm the trial court's conclusion that Heslinger's counterclaims are not barred based on equitable principles, but we reverse the trial court's denial of summary disposition in favor of WIHC on the issue of whether there was just cause for Heslinger's termination and remand for further proceedings. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Sima G. Patel

---

[14] We do not reach any conclusions regarding the merits of any of Heslinger's counterclaims because those issues are not before us.

-11-