*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID COBB, Individually and as Personal Representative of the ESTATE OF IAN COBB, and as Next Friend of LC, Minor, and ANNE COBB,

UNPUBLISHED
March 19, 2025
9:59 AM

Plaintiffs-Appellants,

v

No. 369604
Kent Circuit Court
LC No. 23-005432-NZ

ANDREW VANRYN, LISA VANRYN, and CHRISTOPHER VANRYN,

Defendants-Appellees.

Before: M. J. KELLY, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

In this wrongful death action, plaintiffs appeal as of right the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(8) and dismissing plaintiffs' complaint for failure to state a cause of action. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND

Because summary disposition was granted pursuant to MCR 2.116(C)(8), we rely solely on plaintiffs' complaint for our recitation of the facts, and we accept the allegations as true solely for purposes of resolving this appeal.

This case arises out of the tragic death of Ian Cobb, who was the minor son of David and Anne Cobb[1] and the older brother of LC. Andrew VanRyn was also a minor at the time of the

---

[1] Because these family members share the same last name, they will each be referred to individually by first name.

underlying events in this case. His parents, Lisa VanRyn and Christopher VanRyn,[2] were both physician assistants licensed to practice in Michigan. Ian and Andrew were friends.

At some point in October 2020, Ian and Andrew exchanged messages to arrange for Andrew to sell Percocet pills to Ian. Percocet is a drug containing oxycodone and acetaminophen. Andrew told Ian that he could obtain Percocet for Ian, and the two agreed to meet to complete the transaction.

Andrew visited a known drug house and attempted unsuccessfully to obtain Percocet. Andrew then went to his home, which was owned by his parents, and took what he believed were Percocet pills from his mother, Lisa.

On October 10, 2020, Ian went to a gas station in Comstock Park to meet Andrew and complete the transaction. Ian's girlfriend, Emma Vandonkelaar, and another friend, Harmonie Buitendorp, accompanied Ian. Vandonkelaar and Buitendorp went into the gas station while Ian went to Andrew's car and purchased the pills from Andrew. Vandonkelaar and Buitendorp saw Ian with two pills after he met with Andrew, and Ian told Vandonkelaar and Buitendorp that they were "perks," which is a slang term for Percocet.

Ian, Vandonkelaar, and Buitendorp went back to Vandonkelaar's home in Fruitport. Ian's friend, Elijah Vanderzouwen, was also at the house. Although neither Vandonkelaar nor Vanderzouwen saw Ian use any drugs at Vandonkelaar's house, Vanderzouwen stated that Ian was nauseous, lightheaded, and complained that he was "hot or overheating." Ian drove back to his home in Grand Rapids, where he arrived at approximately 10:30 p.m. Ian's mother, Anne, heard him come home, called out his name, and heard him respond. Ian's sister, LC, also saw Ian around this same time but only spoke to him briefly because he was on the phone. LC recalled that Ian was standing normally and that nothing seemed out of the ordinary.

Ian and Vandonkelaar continued video chatting via FaceTime for "several hours," according to phone records. Vandonkelaar observed Ian "crush and snort" a Percocet pill, which Ian stated was the last pill he had received from Andrew. Immediately after using the pill, Vandonkelaar saw Ian's face become "droopy," as if he did not have control of his facial muscles. Ian also could not speak. According to Vandonkelaar, Ian fell in his bathroom and the phone went dark. Vandonkelaar stayed on the phone and tried to talk to Ian, but he never responded. She could only hear what sounded like Ian gasping for air and struggling to breathe until she only heard silence. Vandonkelaar called Vanderzouwen and asked him to check on Ian. Vanderzouwen was confused and indicated he would check on Ian in the morning. Vandonkelaar subsequently tried calling Ian, but he never answered.

The next morning, LC found Ian lying face down on the bathroom floor. His head was bloody, and he was not moving or responding. LC called to Anne, who came into the room and found LC next to Ian. David came into the room after hearing the screams of Anne and LC. First responders pronounced Ian dead on the scene.

---

[2] Andrew, Lisa, and Christopher will also be referred to individually by first name.

The medical examiner determined that the cause of death was fatal fentanyl toxicity, which is more commonly known as a fentanyl overdose.  The autopsy report did not show the presence of oxycodone, or its metabolite oxymorphone, in Ian's blood.  However, the autopsy report did indicate that fentanyl was present in Ian's blood.

Lisa later admitted that she had pills that she believed were Percocets, which she had obtained from a neighbor, without a valid prescription, and stored in her dog's pill bottle in her home.  These pills were found in the VanRyns' home by police on October 11, 2020.  Lisa and Christopher, as physician assistants, were licensed prescribers of controlled substances.

## II.  PROCEDURAL HISTORY

Plaintiffs brought this action under the Wrongful Death Act, MCL 600.2922.  In the complaint, plaintiffs raised counts of negligence and negligent supervision against Lisa and Christopher, a count of negligence against Andrew, a count of negligent infliction of emotional distress against all defendants, and a count designated "Res ipsa loquitor" against all defendants.

The trial court issued a written opinion and order granting defendants' motion for summary disposition under MCR 2.116(C)(8) and dismissing the complaint in its entirety.  The court ruled that accepting plaintiffs' well pleaded allegations as true, plaintiffs' action was barred by the wrongful-conduct rule because the action was based on an illegal controlled substance transaction between Ian and Andrew that was the "very foundation for every claim Plaintiffs assert, to include the derivative claims alleged against Andrew VanRyn's parents."  The trial court reasoned that "[b]ut for the delivery of the pills by Defendant Andrew VanRyn to Ian and Ian's possession and use of those pills, Ian Cobb would not have died."  The court further ruled that the culpability exception did not apply to prevent plaintiffs' claim from being barred because there was no allegation in plaintiffs' complaint that Andrew knew the pills he sold to Ian were actually Fentanyl and not Percocet.  Regarding plaintiffs' public policy arguments, the trial court concluded that because the "essence of this case is an illegal drug transaction," the public policy rationale for the wrongful-conduct rule—i.e., that courts will not aid a plaintiff whose action is founded on his own illegal conduct—was squarely implicated.

Plaintiffs now appeal.

## III.  STANDARD OF REVIEW

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law."  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

> A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint.  When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone.  A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery.  [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159-160; 934 NW2d 665 (2019) (citations omitted).]

IV. ANALYSIS

On appeal, plaintiffs argue that their cause of action was not barred by the wrongful-conduct rule. They first contend that there was an insufficient causal nexus between Ian's wrongful conduct of seeking to purchase and use Percocet and the fentanyl overdose that caused his death.

Plaintiffs brought this wrongful death action pursuant to MCL 600.2922, which provides in relevant part as follows:

> (1) Whenever the death of a person [or] injuries resulting in death . . . shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured . . . and although the death was caused under circumstances that constitute a felony. [MCL 600.2922(1).]

However, our Supreme Court has explained the wrongful-conduct rule as follows:

> When a plaintiff's action is based, in whole or in part, on his own illegal conduct, a fundamental common-law maxim generally applies to bar the plaintiff's claim:
>
> > [A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party.
>
> When a plaintiff's action is based on his own illegal conduct, and the defendant has participated equally in the illegal activity, a similar common-law maxim, known as the "doctrine of in pari delicto" generally applies to also bar the plaintiff's claim:
>
> > [A]s between parties in pari delicto, that is equally in the wrong, the law will not lend itself to afford relief to one as against the other, but will leave them as it finds them.
>
> We shall refer to these maxims collectively as the "wrongful-conduct rule." Michigan courts have long recognized the existence of the wrongful-conduct rule. [*Orzel v Scott Drug Co*, 449 Mich 550, 558-559; 537 NW2d 208 (1995) (citations omitted; alterations in original).]

The wrongful-conduct rule does not automatically bar a claim merely because a plaintiff was engaged in illegal activity at the time of injury, but the wrongful-conduct rule is instead implicated if the plaintiff's conduct is "prohibited or almost entirely prohibited under a penal or criminal statute." *Id*. at 561. Additionally, "[f]or the wrongful-conduct rule to apply, a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages." *Id*. at 564.

-4-

In *Orzel*, the Supreme Court held that the wrongful-conduct rule barred a tort action brought by the plaintiffs, John Orzel and his relatives, because the asserted injuries arose out of Orzel's illegal conduct. *Id*. at 551-552. Specifically, the plaintiffs claimed that the defendants negligently supplied the prescription drug, and Schedule 2 controlled substance, Desoxyn to Orzel, which caused him to become legally insane after he became addicted to the drug and ingested excessive amounts of the drug over a period of years. *Id*. at 552-554. However, there was evidence that Orzel was illegally obtaining and excessively using the drug without a valid prescription and that he also resorted to deceit to obtain legitimate appearing prescriptions to have filled by pharmacies. *Id*. at 553-555. The Supreme Court concluded that Orzel's serious illegal conduct justified application of the wrongful conduct rule and that the illegal acts committed by Orzel while he was still sane were at least *a* proximate cause of his injuries. *Id*. at 563-564, 567. The Court held that the plaintiffs' claims were barred by the wrongful-conduct rule because they were based at least in part on Orzel's illegal conduct. *Id*. at 577.

In this case, Ian sought to obtain Percocet from Andrew even though Ian did not have a valid prescription for Percocet and Andrew clearly was not a person who could lawfully prescribe or distribute medications. Percocet contains oxycodone, which is a Schedule 2 controlled substance. MCL 333.7214(a)(*i*). Ian and Andrew completed their arranged transaction in which Ian gave Andrew money in exchange for a controlled substance. It turned out that the pills Andrew provided to Ian contained fentanyl. Fentanyl is also a Schedule 2 controlled substance. MCL 333.7214(b).

"A person shall not knowingly or intentionally possess a controlled substance, a controlled substance analogue, or a prescription form unless the controlled substance, controlled substance analogue, or prescription form was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article." MCL 333.7403(1). As our Supreme Court has recognized, "[u]nder the controlled substances act, transactions involving controlled substances are almost entirely prohibited. Improper use of a controlled substance on just one occasion can have a substantially detrimental, and possibly even permanent, effect on the health of the user." *Orzel*, 449 Mich at 563.

The elements of possession of a controlled substance under MCL 333.7403 are "(1) that a defendant possessed a controlled substance, (2) that the defendant knew he or she possessed the controlled substance, and (3) the amount of the controlled substance, if applicable." *People v Robar*, 321 Mich App 106, 131; 910 NW2d 328 (2017). Notably, while the amount of the controlled substance may be an element of this offense, the prosecution is not required to prove that a defendant *knew* the amount of the controlled substance that he possessed. *People v Marion*, 250 Mich App 446, 449; 647 NW2d 521 (2002). Furthermore, the statute states that a "person shall not knowingly or intentionally possess *a* controlled substance, *a* controlled substance analogue, or *a* prescription form" except as authorized. MCL 333.7403(1) (emphasis added). The statute does not make it an element of the crime that the person must possess correct knowledge about the specific controlled substance in his possession; knowledge that he possesses *a* controlled substance appears to be sufficient. MCL 333.7403(1). See also *People v Quinn*, 440 Mich 178, 188; 487 NW2d 194 (1992) ("The Legislature may impose certain penalties regardless of the

actor's criminal intent and regardless of what the actor actually knew or did not know.") (citations omitted).[3]

Moreover, plaintiffs do not provide any authority for the proposition that a person who intends to illegally obtain one specific type of Schedule 2 controlled substance but actually receives a different Schedule 2 controlled substance illegally is somehow not still in violation of MCL 333.7403 based merely on the substitution of controlled substances, which would seem to be an obvious inherent risk of illicit controlled substance transactions. Hence, Ian's conduct was clearly in violation of MCL 333.7403(1), and fell within that broad range of prohibited controlled substance transactions. *Orzel*, 449 Mich at 563.

Ian also used the controlled substance that he illegally possessed after obtaining it from Andrew, which violated MCL 333.7404(1) ("A person shall not use a controlled substance or controlled substance analogue unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article."). Ian's unfortunate death occurred as a result. Ian's conduct involving the possession and use of a Schedule 2 controlled substance was conduct that is "prohibited or almost entirely prohibited under a penal or criminal statute," and his death resulted from this prohibited serious misconduct, thus making the wrongful-conduct rule applicable to this situation. *Orzel*, 449 Mich at 561.

With respect to causation, if Ian had not illegally possessed and used the controlled substance that he obtained from Andrew, he would not have died. Ian would not have come to possess that controlled substance if he had not knowingly and intentionally sought to illegally obtain controlled substances without a prescription through illegal channels. Thus, Ian's conduct was—at a minimum—*a* proximate cause of his death, which is sufficient in this context. *Orzel*, 449 Mich at 567 ("[S]howing that the party's conduct was 'a' proximate cause of the injuries is sufficient."). It cannot be said that Ian's illegal conduct in this case was "not a contributing cause of the injury," such that recovery in tort could be permitted. *Id*. at 565 (quotation marks and citation omitted). Indeed, Ian's unlawful conduct was "at once the source of both his criminal responsibility and his civil right," and his death was "traceable to his own breach of the law," which is "an integral and essential part of his case." *Id*. (quotation marks and citation omitted). Therefore, plaintiffs cannot establish their claims premised on Ian's death without relying on Ian's

---

[3] The Court in *Quinn* further explained:

> The initial development of this method of interpretation of statutes in the nature of police regulation began with laws concerning adulterated food, commerce, and liquor. Familiar contemporary examples include the fact that a reasonable or good-faith mistake regarding a victim's age is not a defense to third-degree criminal sexual conduct . . ., that the prosecution need not prove as an element of the offense of carrying a concealed weapon . . . that the defendant knew his permit was expired, . . . and that a defendant need not know the quantity of narcotics possessed to be found guilty of possession of a controlled substance . . . . [*Quinn*, 440 Mich at 188-189.]

-6-

own serious misconduct, and plaintiffs' claims are barred by the wrongful-conduct rule. *Orzel*, 449 Mich at 558-559.

Nonetheless, plaintiffs next argue that even if the wrongful-conduct rule applies, their action still is not barred because the culpability exception to the wrongful-conduct rule applies under these circumstances. Plaintiffs maintain that defendants' misconduct that caused Ian to receive fentanyl, which is a much more dangerous drug than the Percocet Ian thought he was obtaining, made defendants more culpable than Ian under these circumstances. The *Orzel* Court explained the culpability exception as follows:

> An exception to the wrongful-conduct rule may apply where both the plaintiff and defendant have engaged in illegal conduct, but the parties do not stand in pari delicto. In other words, even though a plaintiff has engaged in serious illegal conduct and the illegal conduct has proximately caused the plaintiff's injuries, a plaintiff may still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries, such as where the plaintiff has acted under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age . . . ." [*Orzel*, 449 Mich at 569 (quotation marks and citations omitted; ellipsis in original).]

In *Stopera v DiMarco*, 218 Mich App 565, 567, 571; 554 NW2d 379 (1996), this Court addressed the wrongful-conduct rule and the culpability exception in the context of an adulterous affair that led to the plaintiff contracting a sexually transmitted disease from the defendant. The plaintiff was a secretary at Ford Motor Company, and the defendant was an executive at Ford. *Id*. at 567. The defendant was married. *Id*. Nonetheless, the plaintiff and the defendant engaged in a sexual relationship that lasted for approximately a year, during which the plaintiff contracted the human papillomavirus (HPV). *Id*. The plaintiff alleged that the defendant knew that he had HPV and breached his duty to inform her of his condition, which resulted in her infection. *Id*.

This Court held that the plaintiff did not fail to state a claim against the defendant, and that her claim was not barred by the wrongful-conduct rule because, although both parties were engaged in the statutorily prohibited conduct of adultery, the plaintiff had alleged that the defendant knew that he was infected with the disease and did not warn her before engaging in a prolonged sexual relationship, which made the defendant significantly more culpable—and "almost entirely responsible" for the plaintiff's injury—under the culpability exception to the wrongful-conduct rule. *Id*. at 569-571. This Court explained that it was the defendant's superior knowledge regarding his disease that put the plaintiff in circumstances constituting a great inequality of condition. *Id*. at 571.

Here, Andrew was also clearly involved in illegal conduct when he sold the controlled substance pills to Ian. MCL 333.7401(1) (prohibiting the delivery of a controlled substance or prescription form unless authorized by law).[4] However, the complaint does not contain any

---

[4] This Court recently held that a portion of this statute was repealed by implication, by the passage of the Michigan Regulation and Taxation of Marihuana Act, with respect to unlicensed commercial

allegations that Ian acted "under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age."[5] *Orzel*, 449 Mich at 569 (quotation marks and citations omitted). Rather, the complaint alleges that Ian wanted Percocet, Andrew wanted money, and the two arranged to meet for purposes of completing this exchange. There also is no allegation in the complaint that Andrew somehow knew that the pills actually contained fentanyl. The allegations reflect that Andrew, like Ian, believed that the pills were actually Percocet pills.[6] The complaint also alleges that Lisa believed the pills that she obtained from her neighbor, and which Andrew took and delivered to Ian, were Percocet pills. Thus, there is no allegation to support the application of the culpability exception. *Id.*; *Stopera*, 218 Mich App at 571.

Contrary to plaintiffs' contentions on appeal, the effect of the wrongful-conduct rule is not to immunize individuals who illegally sell dangerous controlled substances. Rather, that side effect is merely a result of the overriding public policy justifying the wrongful-conduct rule, which is "that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct." *Orzel*, 449 Mich at 559. As the Court explained in *Orzel*,

---

marijuana growing operations. *People v Kejbou*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361377); slip op at 5, 6, 9, lv den 513 Mich 1062 (2024). These circumstances are not implicated in this case.

[5] The complaint does allege that "Defendant Andrew VanRyn also was aware of, and exploited, Ian's mental health conditions and susceptibility to drug use for Defendant Andrew VanRyn's own personal profit." However, even accepting this allegation as true, and without further details regarding Ian's condition which do not appear in the complaint, this allegation is nothing more than an allegation that Ian and Andrew each sought to benefit from the other person's willingness to engage in criminal activity. This allegation is insufficient to warrant application of the culpability exception; as this Court explained in *Stopera*, 218 Mich App at 570 n 3:

> Plaintiff[, who was a secretary at Ford,] also argues that defendant used his position as a "high-powered executive" at Ford along with lies about his intentions to leave his wife to "dupe" plaintiff into the affair. These arguments would not protect plaintiff from criminal liability under the adultery statute and, similarly, they do not trigger the "culpability exception" to the wrongful-conduct rule imposed against plaintiff for her actions in violation of that statute. In the absence of the additional element present in this case, i.e., defendant's alleged failure to inform her of his HPV infection, plaintiff's action would be barred by the wrongful-conduct rule.

[6] Although the complaint does allege that Andrew "knew he could not verify the composition of the pills he provided to Ian as he knew they were not obtained with a valid prescription, but still represented to Ian that they were in fact real Percocets," that is quite different from alleging that Andrew knew the pills contained fentanyl. It seems, even accepting the complaint allegations as true, that both Ian and Andrew were operating under the same risks and faulty assumptions, and there is no allegation that Andrew actually possessed superior knowledge regarding the presence of fentanyl as compared to Ian.

-8-

If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties. As stated by the Court of Appeals, where the plaintiff has engaged in illegal conduct, it should be the "plaintiff's own criminal responsibility which is determinative." [*Id*. at 559-560 (citations omitted).]

Because plaintiffs in the present case cannot establish their cause of action without relying at least in part on Ian's illegal conduct, the trial court did not err by determining that plaintiffs' action was barred by the wrongful-conduct rule and granting summary disposition under MCR 2.116(C)(8) on that basis. *Orzel*, 449 Mich at 558.

Affirmed.

/s/ Michael J. Kelly
/s/ Stephen L. Borrello
/s/ Michelle M. Rick